## EUTECTIC WELDING ALLOYS CORPORATION AND ANOTHER v. WARREN A. WEST.

160 N. W. (2d) 566.

July 12, 1968—No. 40,825.

14

*Carlsen, Greiner & Law* and *Ronald D. Olson,* for appellants.

*O'Conner, Collins & Abramson* and *Theodore J. Collins,* for respondent.

PETERSON, JUSTICE.

Plaintiffs, Eutectic Welding Alloys Corporation and American Eutectic Welding Alloys Sales Co., Inc., (both hereafter referred to as "Eutectic") [1] employed defendant, Warren A. West, as a "technical representative" in the sale of Eutectic's products. A written "Employment Agreement" contained various covenants in favor of Eutectic. One permanently prohibited West from using or disclosing Eutectic's business secrets [2] and another precluded him, for the temporary period of 2 years,

---

[1] Eutectic Welding Alloys Corporation is a manufacturer of welding rods and welding equipment. American Eutectic Welding Alloys Sales Co., Inc., is a subsidiary corporation functioning as the sales arm of the parent corporation. Both are New York corporations and both are jointly referred to as "Eutectic" merely for the convenience of this opinion. West is a Minnesota resident and was employed by the subsidiary.

[2] Paragraph 9(a) of the Employment Agreement provided: "As certain confidential information regarding our products and working methods has been and/or will be furnished to you, you expressly covenant that *you will keep inviolate and never, during and after your employment with us, directly or*

from himself competing with or taking employment with a competitor within a radius of 50 miles of the trade area in which he had been employed.[3]

Defendant was hired in March 1960 and was assigned to a sales territory which included Chisago, Isanti, and Washington Counties and that

*indirectly,* use for yourself (except while you are in our employ and solely in pursuit of your activities as our employee), *disclose, communicate, divulge or furnish to any other person, firm or corporation, any confidential information or business secrets relating to our Company and our parent or affiliated companies, the conduct of our or their operations* and working methods, the materials, processes, plans, designs, models, apparatus, equipment, *names of our or their suppliers* and formulas used in our or their manufacturing operations and experimental investigations, *any commercial or technical information, including our customers' requirements,* improvements or things of which you may have gained knowledge or discovered, invented or perfected while in our employ, or that of our parent or affiliated companies, or within six months after the termination of your employment, or any ideas or processes of manufacture of any product or article sold or distributed by us which may be communicated to you or which you may learn by virtue of your activities under this agreement." (Italics supplied.)

[3] Paragraph 9(d) of the Employment Agreement provided: "As we and our parent and affiliated companies manufacture and/or sell under a variety of trademarks a specialized line of welding materials and products and a specialized line of equipment for use in welding and in connection therewith have developed special formulations and equipment and utilize a specialized technique of sales and service concerning which you will, during your employment with us, receive training and access to confidential information, you agree that *you will not, anywhere in the territory or territories in which you worked in our employ within two years prior to the termination of this agreement and within a radius of fifty miles from any such territory or territories,* without the prior consent of our company, signed by our President or one of our Vice Presidents, *during and for a period of two years after your employment with us ceases, enter the employ of or render any services to any person, firm, partnership or corporation dealing in materials, products or equipment, or a line of materials, products or equipment which compete with any of the materials, products or equipment which we and/or our parent or any of our affiliated companies market,* or engage in any competing business on your account or become interested therein as a director, principal, representative, employee or any other relationship or capacity." (Italics supplied.)

part of Ramsey County "south of and including Highway 36." By unilateral action of the employer his territory was altered from time to time and certain of his major accounts were withdrawn, rights reserved to the employer in the employment agreement. West terminated his employment in February 1965 and was then employed by All-State Welding Alloys Company, Incorporated, a competitor of Eutectic, to sell its products in a region which included Minnesota, together with three other states and three provinces in Canada. Plaintiffs learned of defendant's new employment in March 1965 and in the following July undertook to enforce the two restrictive covenants by an action for damages and permanent injunction.

Plaintiffs withdrew their claim for damages at the commencement of trial, so that the issues litigated relate only to the enforceability of these covenants by injunction. The trial court found, in essence: (1) Defendant was basically a salesman and, evidenced in part by his minimal training and limited efficiency as a welder, he was in effect a technical representative in name only; (2) plaintiffs imparted no significant trade secrets or confidential information to defendant during his employment with them; (3) defendant sold directly to consumers when employed by plaintiffs but in his present employment sells only to distributors, in which selling work he uses no Eutectic sales secrets; (4) plaintiffs had suffered no irreparable injury or damage by reason of any conduct of defendant;[4]

---

[4] Plaintiffs urged, with respect to this finding, that the court erred in failing to find irreparable harm as a necessary inference from proof that the covenants were breached and in failing to grant equitable relief against the threat of probable harm. That an inherent threat of irreparable injury may be inferred from the breach of an otherwise valid and enforceable restrictive covenant of this nature, sufficient to invoke at least temporary equitable relief, was, indeed, indicated in Thermorama, Inc. v. Buckwold, 267 Minn. 551, 125 N. W. (2d) 844. Our disposition of this case on the ground that the first covenant was not breached and that the second covenant, for other and more fundamental reasons, should not be enforced does not require a determination of such issue, except as we observe that the absence of provable injury may itself tend to show that the restrictive covenant is more broad than the legitimate interests of the employer may reasonably require. See, The Menter Co. v. Brock, 147 Minn. 407, 180 N. W. 553, 20 A. L. R. 857; Standard Oil Co. v. Bertelsen, 186 Minn. 483, 243 N. W. 701.

and (5) at least in the circumstances of this case, the restrictive covenants are unreasonable. The court accordingly ordered judgment denying a permanent injunction and vacating a temporary injunction then in effect.[5] Plaintiffs appeal from the judgment thereupon entered.

We hold that the evidence in this case substantially supports the trial court's findings, and we affirm the judgment that the restrictive covenants should not be enforced by a permanent injunction.

The heart of Eutectic's case is that its products and its methods for selling its products are specialized and unique; that the employee has himself expressly acknowledged as much in the employment agreement; and that the restrictive covenants extracted from the employee are a valid protection of its legitimate business interests. The parent company manufactures a line of welding products for use in what is apparently a unique welding process by which metals are joined without their being heated to the melting point. These products include welding rods, electrodes, alloys, pastes, flux, and other related materials and equipment, all of which are competitive with welding products manufactured by defendant's new employer. The subsidiary sales company, defendant's former employer, uses a "technique" of sales and service in which employees, classified as "technical representatives," call directly upon the consumer, the person who does actual welding work, to demonstrate the product line and to instruct the customer in the proper uses of these welding products.

Although two restrictive covenants are in issue, it is difficult to consider them separately because they are based on the common premise that the products and merchandising methods are unique and confidential, justifying broad protection against use or disclosure by the employee.[6]

---

[5] A temporary restraining order, cast in the broad language of the restrictive covenants, had been granted ex parte at the commencement of this action. A temporary injunction had subsequently been granted after hearing, but it was more narrowly drawn, limiting the restraint to only that part of Ramsey County in which defendant had been employed and expressly excluding the specified major customers within that area which plaintiffs had withdrawn from defendant's sales territory.

[6] If only the covenant against competitive employment were in issue, the issue might well be moot, since its 2-year period of limitation has now

In any action for appropriation of trade secrets, it is necessary for the plaintiff to prove that trade secrets in fact existed; that such trade secrets had been acquired by the defendant as a result of a confidential relationship; and that defendant had used and disclosed such secrets. Plaintiffs' evidence indicated that defendant attended monthly "product meetings" where information was disseminated regarding the uses, application, and methods of demonstrating either new products or old products requiring more vigorous promotion. New product bulletins and "technical sales bulletins," marked "confidential," were furnished to defendant and other "technical representatives." Defendant described these materials as "strictly ammunition for salesmen of Eutectic to tell their customers" and, whatever the nature of the technical information they contained, it was intended for communication to customers. Manufacturing processes or the chemical content of the products, however, were never disclosed to technical representatives, presumably because their activities did not require such knowledge.

The court could well find, we think, that there were no significant trade secrets communicated to defendant. The mere fact that a "confidential" label is attached to information is not itself sufficient to elevate ordinary sales information to secretive stature. Stated in the context of that covenant permanently restricting defendant from using or disclosing "confidential information regarding our products and working methods," it is plain that, irrespective of its validity, plaintiffs simply failed to prove that there had been a breach of covenant.

The more critical issue is presented in connection with that covenant which prevented defendant from engaging in competitive activity for a 2-year period following the termination of his employment with plaintiffs. Unlike the other covenant, it is clear that it was breached; that is, defendant, almost immediately after the termination of his employment with plaintiffs, took employment with a competitor. The issue, therefore, is whether the trial court reasonably refused to enforce the covenant by a permanent injunction. We agree with the trial court that the covenant

---

expired. The interrelationship of the two covenants, however, warrants disposition on the merits.

should not be so enforced in the circumstances of this case because plaintiffs had unreasonably extracted from defendant a commitment far broader than his actual functions and status could reasonably require.

Defendant's classification as a technical representative, rather than as an ordinary salesman, was patently more form than substance. Although the corporate function of his immediate employer was to sell its parent's products, it employed no persons classified as salesmen. Notwithstanding defendant's lack of prior experience in welding skills, he became a technical representative from the first day of his employment. He was, it is true, given some employer-sponsored technical training, but that consisted only of a 1-week course in basic welding principles at Dunwoody Institute, a Minneapolis vocational school, and barely 1 week of instruction at plaintiffs' facilities in Flushing, New York, training significantly inferior to that required of a journeyman welder to whom he might offer "technical assistance." His 5 years' employment with plaintiffs may have made defendant somewhat more proficient in selling welding products, but the court could find that any such proficiency was not the result of confidential information confidentially learned from such employment.[7]

The territorial restriction itself, somewhat fortuitously perhaps, proved to be peculiarly unreasonable in the circumstances of this case. Although defendant's sales territory had not included the industrial complex located in Hennepin County, the 50-mile radius incorporated in the restrictive covenant would, if enforced, preclude him from working for his new employer in all of that area. The temporary injunction had not extended to that territory, but the application for permanent injunction was not so limited.

---

[7] Salary and other conditions of employment tend to reflect the employer's practical judgment of the employee's competence and status. Defendant had an annual income of $6,000, plus a small expense allowance. His employment could be terminated upon a mere 2 weeks' notice. He was entitled to the common benefit of 2 weeks' vacation. These and other modest conditions of employment suggest defendant's status as a rather ordinary employee, one to whom neither technical nor sales information of a uniquely sensitive nature would probably be disclosed.

The fundamental principles determining the enforceability of covenants restricting subsequent employment were fully considered in Bennett v. Storz Broadcasting Co. 270 Minn. 525, 134 N. W. (2d) 892, and have particular application to this case. We there held that to extract such covenants from the average employee may become an oppressive restraint upon his opportunities to work and earn a living; that such restrictions may not validly be enforced if they are broader in scope than is necessary to protect a legitimate interest of the employer; that the nature of the employer's business and the nature of the service performed by the employee for that employer must be carefully scrutinized to determine the reasonableness of the restraint; and that careful consideration must be given to achieving a fair balance of these competing considerations in each case, rather than merely resting upon the employer-dictated recitals in the formal employment agreement. Restrictive covenants that serve primarily to prevent an employee from working for others or for himself in the same competitive field so as to discourage him from terminating his employment constitute a form of industrial peonage without redeeming virtue in the American enterprise system.[8]

Affirmed.

---

[8] As we noted in Bennett v. Storz Broadcasting Co. 270 Minn. 525, 134 N. W. (2d) 892, covenants against competition as part of commercial transactions involving business or property transfers are completely distinguishable. See, for example, Larx Co. Inc. v. Nicol, 224 Minn. 1, 28 N. W. (2d) 705, and Venn v. Goedert (8 Cir.) 319 F. (2d) 812. Similarly, restrictive covenants upon business executives and professional employees may be significantly different. See, for example, Granger v. Craven, 159 Minn. 296, 199 N. W. 10, 52 A. L. R. 1356; Andrews v. Cosgriff, 175 Minn. 431, 221 N. W. 642; Shaleen v. Stratte, 188 Minn. 219, 246 N. W. 744. The interest to be protected is more substantial and there is usually some consideration for the restraint other than, as in this case, modest wages paid for modest employment.