MINNESOTA MINING AND MANUFAC-
TURING COMPANY, a Delaware
Corporation, Plaintiff,

v.

Kent A. KIRKEVOLD and Verbatim
Corporation, a California
Corporation, Defendants.

Civ. No. 4–79–623.

United States District Court,
D. Minnesota,
Fourth Division.

April 28, 1980.

Frank Hammond, David C. Forsberg and Margaret K. Savage, Briggs & Morgan, and Mark W. Gehan, Senior Associate Patent Counsel, St. Paul, Minn., for plaintiff Minnesota Mining and Manufacturing Co.

William J. Hanley, Harrigan & Hanley, Minneapolis, Minn., for defendant Kent A. Kirkevold.

James S. Simonson and Stephen J. Snyder, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., and Harry B. Bremond, Wilson, Sonsoni, Goodrich & Rosati, Palo Alto, Cal., for defendant Verbatim Corp.

## MEMORANDUM INCORPORATING FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER FOR A PRELIMINARY INJUNCTION

MacLAUGHLIN, District Judge.

This matter is before the Court on a motion for a preliminary injunction brought by plaintiff Minnesota Mining and Manufacturing Company (3M) to restrain defendant Kent A. Kirkevold, a former employee of 3M, from continuing his employment with defendant Verbatim Corporation (Verbatim) until a trial on the merits or until the time period specified in a covenant not to compete contained in Kirkevold's employment agreement with 3M expires, whichever first occurs. The following memorandum constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). The Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332.

*THE PARTIES*

3M is a Delaware corporation with its principal place of business in Minnesota. The Data Recording Products Division of 3M is engaged in the manufacturing and worldwide marketing of magnetic media, which are various forms of information storage devices used in the operation of computers.

Kent A. Kirkevold is a 40 year old chemist who commenced his employment with

3M in February of 1964 and worked for 3M as a chemist or technician until November 27, 1979. Kirkevold resided in Woodbury, Minnesota, during the time he was employed at 3M, and worked principally in Minnesota. Although Kirkevold has not attained a college degree during his period of employment, he has acquired the equivalent of over three years of college credits. At the time this action was commenced, Kirkevold was domiciled in California. After Kirkevold left his employment at 3M, he commenced working for Verbatim as a senior staff chemist on December 3, 1979.

Defendant Verbatim is a California corporation with its principal place of business in California. Verbatim is a competitor of 3M, as it is involved in the manufacturing and marketing of magnetic media. Verbatim is currently engaged in the development of a rigid disc product, and has enlisted Kirkevold's efforts as an employee to assist in the development of this particular product.

*MAGNETIC MEDIA—THE MANUFACTURING PROCESS AND THE INDUSTRY IN GENERAL*

There are various categories of magnetic media products, and the various products differ in their application and packaging. The three basic categories are comprised of magnetic tape, flexible discs or diskettes, and rigid discs. Magnetic tape is normally placed in cassettes or cartridges. Flexible diskettes and rigid discs are shaped in donut form and come in various sizes—the major distinction between these two products is that the underlying substrate in the case of rigid discs is firmer than the substrate used for flexible discs.

As noted, the purpose of these products is to store information. This information is magnetically recorded and retrieved from the media by use of a "magnetic head" which determines the information by sensing the state of magnetization. This process is characterized by extremely close tolerances between the magnetic head and the tape, disc or diskette, often as close as 20 to 30 millionths of an inch.

A critical aspect of the manufacturing of magnetic media products is generally (and somewhat simplistically) accomplished by "coating" a substrate with what is known as a magnetic dispersion. In the case of a rigid disc, the substrate consists of an aluminum alloy, while magnetic tape and flexible diskettes utilize a polyester substrate. The magnetic dispersion process involves coating the substrate with a fluid mixture composed of magnetic iron oxide particles, a polymer or binder, a dispersant, curing or cross-linking agent and certain solvents. A dispersant is utilized to disperse the iron oxide particles evenly so as to avoid agglomeration of the magnetic particles. If the particles are not distributed evenly on the substrate (and therefore tend to agglomerate) the end result is poor recording performance. The curing agent or cross-linking agent is a chemical which is used to contribute to a proper bonding of the iron oxide particles to the substrate. These various components are mixed and then the substrate is coated by the fluid dispersion, which later hardens. A lubricant is used by 3M in connection with its rigid disc product in order to reduce the effect of friction between the magnetic head and the disc. Other than the dispersion, the various other stages in the manufacturing process include the measuring, cleaning and precoating of the substrate, as well as the polishing and cleaning of the finished product. Kent Kirkevold, in his capacity as a chemist for 3M, was involved primarily in the dispersion process, and was identified by Dr. Bruce Torp, the technical director of 3M's data recording products division, as "an expert on . . . [the] manufacture of coated products," and more specifically "dispersion making, the putting of magnetic particles into polymer, and the coating of those loaded polymer systems, or dispersions . . . onto substances."

The magnetic media industry in general is a competitive and rapidly changing technological field. The technological advances in the magnetic media industry and in particular the magnetic dispersion process have been and in all probability will continue to be fast paced. 3M is a leader in the mag-

netic media industry, as is Verbatim in the flexible diskette aspect of the industry. Verbatim, as noted, is in the process of developing a rigid disc product. Both 3M and Verbatim take extensive security measures to assure that the confidentiality of their manufacturing and other processes is not diminished. Due to these prevalent security measures, the only means at the disposal of competitors in the magnetic media industry to determine the extent of a competitor's knowledge is through competitive analysis of products or through the study of patents. With respect to competitive analysis, it is not technologically possible to reconstruct the formulas or processes utilized in the development of a finished magnetic media product.

*KIRKEVOLD'S EMPLOYMENT AT 3M*

On February 24, 1964, Kent Kirkevold signed an employment agreement with 3M, and began working as a technician for 3M. As is 3M's policy for all persons employed in a technical capacity at 3M, the employment agreement contained a covenant not to disclose confidential information and a covenant not to compete. A copy of the agreement is attached to this opinion. The pertinent provisions of the 3M-Kirkevold employment agreement [1] provide as follows:

2. CONFIDENTIAL INFORMATION means information, not generally known, about 3M's processes and products, including information relating to research, development, manufacture, purchasing, accounting, engineering, marketing, merchandising and selling.

\*　　\*　　\*　　\*　　\*　　\*

4. CONFLICTING PRODUCT means any product or process of any person or organization other than 3M, in existence or under development, which resembles or competes with a product or process

upon which I work during the last two years of my employment by 3M, or about which I acquire CONFIDENTIAL INFORMATION through my work with 3M.

5. CONFLICTING ORGANIZATION means any person or organization which is engaged in, or about to become engaged in, research on or development, production, marketing or selling of a CONFLICTING PRODUCT.

I AM EMPLOYED OR DESIRE TO BE EMPLOYED BY 3M IN A CAPACITY IN WHICH I MAY RECEIVE OR CONTRIBUTE TO CONFIDENTIAL INFORMATION; I THEREFORE AGREE:

\*　　\*　　\*　　\*　　\*　　\*

B. EXCEPT as required in my duties to 3M, I will never use or disclose any CONFIDENTIAL INFORMATION.

\*　　\*　　\*　　\*　　\*　　\*

E. For a period of two years after termination of my employment by 3M:

\*　　\*　　\*　　\*　　\*　　\*

b. If I have been or am employed by 3M in a non-sales capacity, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified, and which as to part of its business is not a CONFLICTING ORGANIZATION, provided 3M, prior to my accepting such employment, shall receive separate written assurances satisfactory to 3M from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly in connection with any CONFLICTING PRODUCT.

If I am unable to obtain employment consistent with my training and education, solely because of provisions of this

1. Other provisions of this employment agreement include reporting requirements regarding the efforts made by the former employee to obtain employment, a clause relieving 3M of liability for the monthly payments to former employees should the employee fail to make such reports, and a clause which allows 3M to terminate its payments upon the former employee obtaining suitable employment. During

opening arguments, 3M's counsel informed the Court that should a preliminary injunction be granted, 3M would pay Kirkevold the monthly payments required by the agreement "without qualification" during the period of the preliminary injunction, irrespective of reporting requirements or efforts by Kirkevold to obtain employment. The preliminary injunction issued by the Court reflects these commitments.

Paragraph E, such provisions shall bind me only as long as 3M shall make payments to me equal to my monthly base pay at termination (exclusive of extra compensation or employee benefits) for each month of such unemployment.

\* \* \* \* \* \*

G. THE LAW of the State of Minnesota shall govern this AGREEMENT.

\* \* \* \* \* \*

The covenant not to render services to any conflicting organization for a two year period after leaving the employ of 3M is the critical provision in issue here which 3M seeks to enforce against Kirkevold. Such a covenant is essentially a covenant not to compete.

During Kirkevold's 15 year tenure at 3M, he was employed in various capacities, and due to his abilities and expertise, progressed to a point where he had assumed extensive responsibility in a "troubleshooting" role with respect to production problems. Kirkevold's major concentration during his employment at 3M was in the area of flexible media. During the last four months of his employment at 3M, however, Kirkevold was engaged in projects concerning 3M's rigid disc products. The "troubleshooting" role led to extensive traveling, and led to work in 3M's plants in Freehold, New Jersey, Weatherford, Oklahoma, and Camarillo, California. During the latter part of his employment at 3M, Kirkevold was also involved as a member of a number of 3M task forces, which are collective efforts on the part of 3M personnel to study and resolve certain production problems. During his last few years at 3M, Kirkevold became increasingly dissatisfied with his progression at 3M, as the lack of a college degree militated against his goal of becoming a supervisor and gaining managerial responsibility. This dissatisfaction led Kirkevold to approach his supervisors on numerous occasions to inquire about his professional progress at 3M. Although Kirkevold's salary increased substantially during the last few years of his employment, no doubt due in part to his significant role in the development of magnetic media products at 3M and the glowing job evaluations he received, his dissatisfaction with his professional progress as well as the burdens placed on him by the extensive travel led him to become disillusioned about his future prospects at 3M. When Kirkevold resigned his position at 3M his salary, exclusive of fringe benefits, amounted to $26,700.00 per year.

*THE TRANSITION TO VERBATIM*

On August 10, 1979, Kent Kirkevold was contacted by telephone at 3M by Valerie Navarro, an executive recruiter employed at Management Recruiters in San Francisco, who inquired about Kirkevold's possible interest in a manager position with a bay area corporation engaged in the production of magnetic media. Kirkevold expressed his interest, and without indicating the identity of the corporation or the nature of the position, Valerie Navarro stated that someone would contact him in the future. That evening, Kent Kirkevold was contacted by telephone by Jack Sartin, the product line manager of rigid discs at Verbatim, and the former process engineering manager for 3M at its Weatherford, Oklahoma plant, which manufactured flexible and rigid discs. Sartin left his employment at 3M in May or June of 1979 and began new employment at Verbatim shortly thereafter. As he explained to Kirkevold, Sartin's purpose at Verbatim was to develop and manage a pool of personnel who would collectively plan the development of a new rigid disc product at Verbatim. Sartin explained that the personnel in this pool would ultimately become the management of Verbatim's future rigid disc operations.

Kirkevold discussed these overtures the following day with his 3M supervisor, David Clark. At that time, David Clark informed Kirkevold that "one should take a look at those offers from time to time to be able to tell where one's place [is] in the industry, what one's worth [is]." Kirkevold had frequent conversations with Clark during the fall of 1979 concerning the prospect of working at Verbatim. Kirkevold had conversations about this subject with other 3M officials as well, including Robert C. Wat-

ters, 3M's data products recording division manufacturing director, A. E. Smith, the division vice president, Dennis Matthias, a manager at the Camarillo, California plant, and others. At no time prior to his departure was Kirkevold informed by any of these officials that 3M would attempt to enforce the covenant not to compete contained in the employment agreement if Kirkevold went to work at Verbatim. However, on many occasions during these conversations, 3M officials expressed their concern about the possibility of Kirkevold being able to work for Verbatim without disclosing any of 3M's confidential information.

Kirkevold visited the Verbatim plant in California in October, and informed his supervisor about the visit as well as the ongoing negotiations in general terms. After rejecting one offer of employment from Verbatim and after further negotiations, Kirkevold received another offer of employment from Verbatim. In this second offer, Verbatim offered Kirkevold a $36,000 salary, a 15% annual bonus and an undefined stock option.

At meetings on November 26th and 27th between Kirkevold, Robert Watters and A. E. Smith, the subject of Kirkevold working for Verbatim was discussed, as well as the disclosure of 3M's confidential information. At those meetings, 3M officials attempted to stress the positive aspects of Kirkevold remaining at 3M, as opposed to threatening him with legal action should he leave to work for Verbatim. At the meeting on the 27th, Watters outlined a "career path" to Kirkevold, which would have included a promotion to a position in the Weatherford, Oklahoma facility, as well as possible future managerial responsibility. In a subsequent letter, Watters indicated that the lack of a college degree would not have precluded an advance to a management position, although if Kirkevold obtained his degree, his advancement, according to the letter, would of course be "facilitated."

Kirkevold rejected the proposed "career path" at these meetings and informed 3M officials of his intention to resign. At these meetings, Kirkevold informed his 3M superiors that he felt it would be possible to work at Verbatim without disclosing or using such information. Kirkevold, as well as Verbatim, has steadfastly maintained that position throughout these proceedings. After informing 3M officials of his intention to leave 3M, Kirkevold was escorted out of the 3M building, and his employment there ended on November 27, 1979.

The following day Kirkevold contacted Jack Sartin, and accepted the offer of employment from Verbatim. As noted, Kirkevold commenced his employment at Verbatim's plant in California on December 3rd. According to Kirkevold, his principal present objectives at Verbatim are to "architecturally and equipmentwise build and staff a laboratory" for the production of rigid discs, as well as to work with a management group "in terms of design concepts for a milling facility for rigid discs . . ." The term "milling" relates to the magnetic dispersion process. At the time of the hearing, Kirkevold was engaged in stocking Verbatim's laboratory facility with equipment and had not performed any tasks directly involved with Verbatim's manufacturing processes, although the prospect of being so involved is certainly a realistic one.

## APPLICABLE LAW

Defendants have argued that California law, which would prohibit the enforcement of the type of covenant not to compete in issue here, applies in this proceeding. Cal. Civ.Code, Business and Professions § 16600; *Winston Research v. Minnesota Mining & Manufacturing Co.*, 350 F.2d 134 (9th Cir. 1965). In this regard, defendants argue that any torts which may be occurring are being committed in California by California citizens, and thus California's interest in having its law applied is paramount.

The Court has determined that Minnesota law applies to the present motion for a preliminary injunction, whether plaintiff's claims are characterized as contract or tort claims. Several reasons support the Court's conclusion.

It is well settled that a federal district court applies the conflict of laws principles of the state in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The employment agreement here provides that the "LAW of the State of Minnesota shall govern this AGREEMENT." The employment agreement was also executed in Minnesota between Minnesota residents. In *Combined Insurance Co. of America v. Bode*, 247 Minn. 458, 463–64, 77 N.W.2d 533, 536 (1956), the Minnesota Supreme Court articulated the general principles governing choice of law questions in contract disputes:

> Plaintiff and defendants, as well as the trial court, have proceeded on the theory that the law of Illinois governs in determining the issues involved in this case. We need go no further than to hold that the law of Illinois governs as to the proper construction of the contract. The place of making is where the last act necessary to give validity to the contract is performed. Here the last act to be performed under the express terms of the contract was the signing of the contract by plaintiff in Chicago, Illinois.

> We are also committed to the rule that the parties, acting in good faith and without an intent to evade the law, may agree that the law of either state shall govern. Here the parties expressly agreed that the law of Illinois should govern.

[footnotes omitted]. In *Alside, Inc. v. Larson*, 300 Minn. 285, 220 N.W.2d 274 (1974), in a case involving a restrictive covenant in an employment agreement, the Minnesota court again reiterated that "in the absence of evidence to the contrary, [it is presumed] that the parties to a contract have intended that the law of the place of contracting should govern as to questions of validity and legal effect." *Id.* at 294, 220 N.W.2d at 279, *quoting Larx Co. Inc. v. Nicol*, 224 Minn. 1, 10, 28 N.W.2d 705, 710 (1946). The *Alside* court also rejected an argument made by defendants here insofar as it held that the parties would not have intended that the law of a state govern their agreement which would render the agreement unenforceable. Thus, as two Minnesota residents entered into an employment agreement in Minnesota which specified that Minnesota law should govern, well established conflicts principles require that this Court apply Minnesota law to plaintiff's breach of contract claim.

The conclusion reached by the Court would not differ if the Court applied the methodology of *Milkovich v. Saari*, 295 Minn. 155, 203 N.W.2d 408 (1973), which is generally operative in tort claims. *Cf. Hague v. Allstate Ins. Co.*, 289 N.W.2d 43, Finance and Commerce, April 7, 1978, at 3; August 31, 1979 (rehearing), *cert. granted sub nom., Allstate Ins. Co. v. Hague*, 444 U.S. 1070, 100 S.Ct. 1012, 62 L.Ed.2d 750 (1980) (*Milkovich* criteria applied to insurance contract). In *Milkovich*, the Minnesota Supreme Court announced five factors relevant to the choice of law methodology:

> (a) Predictability of results; (b) maintenance of interstate and international order; (c) simplification of the judicial task; (d) advancement of the forum's governmental interests; and (e) application of the better rule of law.

*Id.* at 161, 203 N.W.2d at 412.

A consideration of the *Milkovich* criteria requires the application of Minnesota law. First, Minnesota has a long history of recognizing the validity of the type of restrictive covenant which underlies plaintiff's claims. Second, Minnesota has a significant interest in protecting Minnesota corporations from the loss of trade secrets and confidential information. It is also undeniable that Minnesota has a significant connection with the facts here, as the employee in the center of this dispute worked in Minnesota for 16 years for a corporation with its principal place of business in Minnesota and thus accumulated certain information about 3M's operations. Furthermore, by virtue of the employment agreement's designation that Minnesota law govern this agreement, the factor of predictability of result would be undermined should California law apply. Finally, it would seem that Minnesota's propensity to enforce restrictive covenants which are "reasonable" would lead the Minnesota Su-

preme Court to the conclusion that Minnesota has the "better law."

Thus, the merits of this motion must be adjudicated in the context of Minnesota law. The standards for the issuance of a preliminary injunction are well settled. Under *Fennell v. Butler*, 570 F.2d 263, 264 (8th Cir.), *cert. denied*, 437 U.S. 906, 98 S.Ct. 3093, 57 L.Ed.2d 1136 (1978), a preliminary injunction may issue:

> upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*See Modern Controls, Inc. v. Andreadakis*, 578 F.2d 1264 (8th Cir. 1978).

*COVENANTS NOT TO COMPETE*

There are two covenants in the 3M-Kirkevold employment agreement which 3M has sought to enforce against Kirkevold. The first concerns confidential information, whereby Kirkevold promised to "never use or disclose any CONFIDENTIAL INFORMATION." [2] The second covenant is essentially a covenant not to compete, whereby Kirkevold promised, for a period of two years after the termination of his services with 3M, to not "render services, directly or indirectly, to any CONFLICTING ORGANIZATION . . . ." A conflicting organization under the agreement means an organization which is or will be engaged in "research on or development, production, marketing or selling" of a conflicting product, which in turn is defined as any "product or process" which "resembles or competes with a product or process" which the employee has worked on during the last two years of his employment with 3M. Under the terms of the employment agreement, Verbatim amounts to a "conflicting organization" as its development of a rigid disc product will eventually compete with 3M's rigid disc product, and Kirkevold, during the last four months of his tenure at 3M, performed important tasks in connection with 3M's rigid disc products.

■■■ Generally, as these covenants not to compete tend to operate as a restraint of trade and have substantial harmful effects, they are to be carefully scrutinized, but are enforceable if they are reasonable and protect a legitimate interest of the employer. *Cherne Industrial, Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81 (Minn.1979); *Walker Employment Service, Inc. v. Parkhurst*, 300 Minn. 264, 219 N.W.2d 437 (1974); *Eutectic Welding Alloys Corp. v. West*, 281 Minn. 13, 160 N.W.2d 566 (1968); *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 134 N.W.2d 892 (1965). In *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 534, 134 N.W.2d 892, 899 (1965), the Minnesota court set forth the test to be employed with respect to restrictive covenants not to compete in employment agreements:

> The test applied is whether or not the restraint is necessary for the protection of the business or good will of the employer, and if so, whether the stipulation has imposed upon the employee any greater restraint than is reasonably necessary to protect the employer's business, regard being had to the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends.

> Restrictions which are broader than necessary to protect the employer's legitimate interest are generally held to be invalid, and the determination of the necessity for the restriction is dependent upon the nature and extent of the business, the nature and extent of the service of the employee, and other pertinent conditions.

[footnote omitted]. *See also Walker Employment Service, Inc. v. Parkhurst*, 300 Minn. 264, 219 N.W.2d 437 (1974). The reasonableness of the covenant not to com-

---

**2.** As the plaintiff in this action has not established that there has been a breach of the covenant not to disclose confidential informa-

tion, the Court's decision is premised only on the enforceability of the covenant not to compete contained in the employment agreement.

pete must be evaluated in the context of the employee's responsibilities and functions, as an employer cannot "unreasonably" extract from its employees commitments which are "far broader" than the employee's "actual functions and status." *Eutectic Welding Alloys Corp. v. West*, 281 Minn. 13, 19, 160 N.W.2d 566, 570 (1968). In *Eutectic Welding*, relied on by defendants,[3] the court refused to enforce a noncompete clause in an employment agreement entered into by a salesman, in part because the employee had no knowledge of "[m]anufacturing processes" or the "chemical content" of plaintiff's products.

■ In *Modern Controls, Inc. v. Andreadakis*, 578 F.2d 1264 (8th Cir. 1978), the Court of Appeals applied Minnesota law to preliminarily enjoin plaintiff's former employee from working for a competitor, the Burroughs corporation, for a period of two years under a covenant not to compete which is remarkably similar in language and effect to the covenant not to compete in the present case. *Modern Controls* also involved the computer industry, as the employee, Andreadakis, was engaged in efforts to develop a marketable flat panel gas discharge display device used to display information from the computer to its user for both his former employer, Modern Controls, and his new employer, Burroughs. In concluding that Modern Controls had made a clear showing of probable success on the merits and possible irreparable injury so as to justify the issuance of a preliminary injunction, the Court of Appeals commented on aspects of the employer's burden of proof:

To require an employer to prove the existence of trade secrets prior to enforcement of a covenant not to compete may defeat the only purpose for which the covenant exists. An employer need only show that an employee had access to confidential information and a court will then determine the overall reasonableness of the covenant in light of the interest sought to be protected.

*Id.* at 1268.[4] Further, in analyzing the possibility of irreparable injury, the *Modern Controls* court noted:

The possible disclosure of trade secrets and confidential information is certainly relevant in determining the potential harm to an employer. However, such information may be disclosed in more subtle ways than outright disclosure to a third party. As Professor Harlan M. Blake noted,

[e]ven in the best of good faith, a former technical or "creative" employee working for a competitor, or in business for himself in the same or a related field, can hardly prevent his knowledge of his former employer's confidential methods or data from showing up in his work. And utmost good faith cannot always be expected. (Footnote omitted.)

Blake, *Employee Agreements Not to Compete*, [73 Harv.L.Rev. 625, 669–70 (1960)].

It is unrealistic to expect that Andreadakis has not utilized confidential information gained at Modern Controls when

**3.** In *Eutectic Welding*, the Minnesota Supreme Court refused to enforce a covenant not to compete against plaintiff's former employee, who was employed as a "technical representative" in the sale of Eutectic's products. The court found that the employee was functionally an "ordinary salesman" who possessed no confidential information, and therefore the covenant not to compete was overbroad and unjustifiable. *Eutectic Welding Alloys Corp. v. West*, 281 Minn. 13, 19, 160 N.W.2d 566, 570 (1968). The Minnesota court's decision in *Eutectic Welding* is completely distinguishable from the instant proceeding, as Kent Kirkevold, a technical employee, had access to sensitive confidential information which was the property of 3M.

**4.** This passage illustrates that an employer need not divulge in precise and unmistakable terms the nature of the trade secrets or confidential information the employer seeks to protect by attempting to enforce a covenant not to compete. Prior to and during the hearing, the defendants have argued that it is necessary for plaintiff to disclose the precise identity of the information 3M contends is confidential. The Court denied this discovery request in light of *Modern Controls*, and because such a requirement would effectively cause employers to forego enforcing contractual rights which they possess under Minnesota law.

working on an identical product at Burroughs. It is equally unrealistic to expect that this confidential information will not give Burroughs a significant advantage over its significantly smaller competitor. Burroughs has the capacity to devote a large amount of its resources to the development of a competing device that would eliminate Modern Controls' competitive advantage. Andreadakis's knowledge would be invaluable in this respect. These factors lead to the conclusion that Modern Controls will suffer irreparable harm.

*Id.* at 1270 [footnote omitted].

In the present context, as in *Modern Controls*, the reasonableness of the covenant not to compete contained in the 3M–Kirkevold employment agreement is premised on 3M's need to protect against the possible disclosure of its trade secrets or confidential information.

## PROBABLE SUCCESS ON THE MERITS

### A. Access to Confidential Information

In *Cherne Industrial, Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81 (Minn.1979), the Minnesota court held that a list of customers amounted to confidential information and affirmed an injunction which prohibited some former employees of plaintiff from using such lists. The *Cherne* court articulated certain factors in an effort to clarify what amounted to trade secrets or protectable confidential information under Minnesota law:

> Certain common elements can be distilled from these definitions and fashioned into a workable test encompassing both concepts [trade secrets and confidential information]. The elements comprising that test are: (1) the protected matter is not generally known or readily ascertainable, (2) it provides a demonstrable competitive advantage, (3) it was gained at expense to the employer, and (4) it is such that the employer intended to keep it confidential.

*Id.* at 90.

During Kent Kirkevold's career as a coating chemist at 3M, his work was focused in the area of flexible discs, and for the last four months or so of his employment at 3M, on rigid discs. Much of 3M's evidence regarding confidential information focuses on the rigid disc area (although the dispersion process is to some extent common to both flexible and rigid discs), as Kirkevold's principal responsibilities at Verbatim are in connection with rigid discs.

The determination as to whether information which 3M contends is confidential is in fact protectable confidential information is dependent on the first two elements noted in *Cherne Industrial, Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81 (Minn.1979), that the information is not generally known or readily ascertainable and provides the proprietor with a demonstrable competitive advantage. There is no reasonable dispute here that the information related to the dispersion process which 3M claims is confidential was intended by 3M to remain confidential, and was developed at the expense of 3M. In this latter respect, in 1979 3M spent over eight million dollars in research and development which relates to magnetic media products. In the four years prior to 1979, 3M spent over five million dollars annually in data recording products division research and development.

3M, as does Verbatim, takes elaborate internal security measures at their various magnetic media facilities to safeguard information which they deem confidential. As noted previously, the process of competitive analysis of magnetic media products will not in itself reveal the formulas of various chemicals or the nature of the processes used in the development or manufacture of a magnetic media product. 3M, through the testimony of Dr. Bruce Torp, the technical director of 3M's data recording products division, and Robert Watters, the division's manufacturing director, established that a significant amount of information related to the manufacture and development of 3M's rigid disc products and magnetic media products in general was confidential. More precisely, this opinion evidence established that the formulas of the lubricant, curing agent and dispersant

used in 3M's rigid disc dispersion process, as well as certain equipment and methods used in 3M's rigid disc manufacturing, were not generally known or readily ascertainable. In addition, certain experimental work orders authored by Kirkevold, as well as the information contained in reports of 3M's Camarillo Task Force of which Kirkevold was a member, also amount to information which is not generally known or readily ascertainable.

The testimony of Dr. Torp and Robert Watters also established that the information outlined above provided 3M with a demonstrable competitive advantage. According to a 1979 independent market study known as the Datamation Brand Preference Study of the Data Processing Industry for the OEM (original equipment manufacturers) and End User Markets, 3M ranks in the top three in terms of brand recognition in a number of areas in both markets, including rigid discs. The customer acceptance indicates the high quality of 3M's magnetic media products. The confidential character of the information outlined above has contributed and will contribute to the quality and commercial success of 3M's magnetic media products, including its rigid disc products. Thus, the information 3M regards as confidential without question provides 3M with an advantage over its competitors.

■ For the reasons set forth above, the Court has determined that the formulas of the lubricant, curing agent and dispersant used in 3M's rigid disc dispersion process, certain equipment and methods used in 3M's rigid disc manufacturing, the contents of certain experimental work orders authored by Kirkevold, and the information contained in reports of 3M's Camarillo Task Force, all amount to trade secrets and confidential information within the meaning of the *Cherne* decision.

3M has also made a clear showing that Kent Kirkevold, by virtue of his employment at 3M, had knowledge of and access to all the confidential information specified above. All of this information is relevant to the development and production of a rigid disc product.

■ In light of 3M's evidence regarding Kirkevold's knowledge of and access to 3M's confidential information, the Court of Appeals' decision in *Modern Controls, Inc. v. Andreadakis*, 578 F.2d 1264 (8th Cir. 1978) mandates a finding that the covenant not to compete in the instant case is reasonable under the circumstances, as it is premised on 3M's legitimate need to protect its confidential information, and is not, under Minnesota law, unreasonably broad.

### B. *Waiver and Estoppel*

Based on the failure of 3M to advise Kirkevold that it would attempt to enforce the employment agreement's covenant not to compete prior to his departure from 3M and the failure of 3M to attempt to enforce such restrictive covenants against other former employees who possessed knowledge of 3M's confidential information, the defendants argue that 3M has waived its contractual rights or should be estopped for equitable reasons from asserting its rights under the 3M–Kirkevold employment agreement. For the reasons which follow, defendants' arguments must be rejected.

■ A waiver is an intentional relinquishment of a known right—in order to find a waiver of a contractual right, the facts must "reasonably lead to the inference that the person against whom it is to operate did in fact intend to waive his known right." *Colvin Lumber & Coal Co. v. J.A.G. Corp.*, 260 Minn. 46, 51, 109 N.W.2d 425, 429 (1961). A waiver can be inferred from conduct or silence. *Id.* Principles underlying the doctrine of equitable estoppel are similar. In *Village of Wells v. Layne-Minnesota Co.*, 240 Minn. 132, 141, 60 N.W.2d 621, 627 (1953), the Minnesota Supreme Court stated:

Equitable estoppel arises from the conduct of a party. It includes his spoken or written words, his positive acts, and his silence or negative omission to do anything. Its foundation is justice. Its object is to prevent the inequitable assertion or enforcement of claims or rights

which might have existed or have been enforceable by other rules of law unless prevented by the estoppel. Its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel. It may arise where a party remains silent when it is his duty to speak or in failing to assert a right and knowingly permitting another to act to his prejudice when the assertion of the right would have avoided the loss.

[footnote omitted]. *See Kuhlmann v. Educational Publishers, Inc.*, 245 Minn. 171, 178, 71 N.W.2d 889, 894 (1955) (as plaintiff's silence or failure to act amounted to no more than "passive approval" which could not be characterized as overt action inconsistent with her rights, plaintiff was not estopped from a later assertion of her contractual rights).

■ As noted, defendants have argued that 3M's failure to inform Kirkevold of its intention to enforce the covenant not to compete against him prior to his departure from 3M, as well as the "encouragement" given Kirkevold to explore the job market by his superiors, is sufficient to establish a waiver on 3M's part, or at least an estoppel. This argument, coupled with 3M's failure to enforce restrictive covenants against other former employees who possessed comparable confidential information to Kirkevold, such as Jack Sartin, justifies the conclusion that 3M should be estopped from asserting its rights or that a waiver has occurred, according to defendants.

The Court cannot agree. First of all, it is not necessarily inconsistent with the later assertion of its right to enforce a covenant not to compete for an employer to refrain from attempting to prevent an employee's exploration of job opportunities, particularly where the employer is not certain as to the subject matter of the employee's potential future employment. In this connection, it was unclear to 3M at the outset of Kirkevold's negotiations with Verbatim whether Kirkevold's potential future duties at Verbatim would without question be in an area in which he would or could use 3M's confidential information. Second, 3M's conduct on the whole cannot be characterized as overt action inconsistent with its later assertion of its contractual rights, as 3M's silence on the subject of enforcement of the covenant not to compete did not reasonably manifest an intention to relinquish its rights. *Kuhlmann v. Educational Publishers, Inc.*, 245 Minn. 171, 71 N.W.2d 889 (1955). Third, in light of 3M's continual overtures to Kirkevold about the prospect of Kirkevold working at Verbatim without disclosing 3M's confidential information, any reliance by Kirkevold or Verbatim on 3M's failure to inform Kirkevold of its intentions cannot be characterized as reasonable.

Kirkevold's situation is distinguishable from other former 3M employees who possessed 3M's confidential information. Many of these 3M employees went to work for competitors in areas where they did not have a reasonable opportunity to use the confidential information they had previously acquired at 3M. Kirkevold's situation is also somewhat different from others because of the sensitive nature of the information he had knowledge of and access to. In this regard, Robert Watters distinguished Kirkevold's position from Jack Sartin's on the grounds that it was unlikely that Jack Sartin knew the chemical structure of the dispersant, curing agent or lubricant, which, is a critical aspect of the competitive advantage possessed by 3M. Moreover, other considerations, such as choice of law matters, were relevant in 3M's decision to not assert any rights it possessed against Sartin. All things considered, the failure of 3M to attempt to enforce similar covenants against other former employees is not overly probative of any intent to relinquish its contractual rights or to knowingly mislead Kirkevold and Verbatim so as to estop 3M from enforcing the covenant in question. For the Court to hold otherwise would effectively place employers in the precarious position of being compelled to enforce all such restrictive covenants with respect to all its former employees, which might encourage attempts to restrain trade, and which might undermine labor relations.

In light of the Court's conclusions with respect to the reasonableness of the covenant not to compete and the affirmative defenses raised by defendants, the conclusion is inescapable that plaintiff has made a clear showing of probable success on the merits. *Modern Controls, Inc. v. Andreadakis,* 578 F.2d 1264 (8th Cir. 1978), *Fennell v. Butler,* 570 F.2d 263 (8th Cir.), *cert. denied,* 437 U.S. 906, 98 S.Ct. 3093, 57 L.Ed.2d 1136 (1978).

*THE POSSIBILITY OF IRREPARABLE INJURY*

3M's central contention with respect to the possibility of irreparable injury is that the use or disclosure of its protectable confidential information or trade secrets would tend to diminish its competitive advantage in the rigid disc market. The defendants advance a number of contentions with regard to 3M's claim of injury. Again, defendants point out that 3M's failure to attempt to enforce such restrictive covenants against its former employees infers that 3M will not possibly suffer irreparable harm. The defendants also have continually expressed their intentions to not disclose or acquire, as the case may be, any of 3M's confidential information. Further, even assuming that Kirkevold were to actually disclose 3M's confidential information to Verbatim, Verbatim contends that any disclosure could not injure 3M because Verbatim could not use such information. Defendants therefore reason that there is no real threat of injury in the event of disclosure, and therefore a preliminary injunction is not warranted.

■ The issue of whether 3M has shown the requisite injury for a preliminary injunction must again be analyzed in light of the Court of Appeals' decision in *Modern Controls, Inc. v. Andreadakis,* 578 F.2d 1264 (8th Cir. 1978), which took a rather expansive view of what constitutes possible irreparable injury. In this regard, the *Modern Controls* court rejected an identical argument made by defendants here, that a claimed intention not to disclose or receive confidential information was insufficient to negate the realistic threat of disclosure and the possibility of irreparable harm. *Id.* at 1269–70. Further, *Modern Controls* noted that it would be "unrealistic" to expect a former employee not to utilize in some fashion in his new employment, although short of direct disclosure, confidential information he obtained while working for a former employer. *Id.* at 1270. The rejection of this argument in *Modern Controls* has inevitable application to the defendants' contentions regarding their intent not to disclose or acquire such information, and consequently their claimed intentions are not sufficient to diminish the realistic prospect of disclosure or use of 3M's confidential information and potential for irreparable harm.

The argument advanced by defendants with respect to 3M's lack of legal action against its former employees was rejected earlier, and for the same reasons compels the conclusion that 3M's failure to assert any contractual rights against employees other than Kirkevold is not probative of any absence of injury on 3M's part.

■ According to Dr. Geoffrey Bate,[5] the Vice President for Advanced Development for Verbatim, even if Kirkevold were to disclose the confidential information relating to 3M's dispersion formulation or process in general, or the specifics in terms of the chemical formulas of 3M's dispersant, curing agent or lubricant, Verbatim would have no use for such information. Dr. Bate asserted that because Verbatim does not have access to the precise ingredients in the 3M dispersion formulation (which would include the magnetic particles, dispersants, cross linking agent or substrate) any knowledge of the formulas or processes used by 3M in connection with its rigid disc product would be of no use to Verbatim because of

---

**5.** Dr. Bate testified that Verbatim's present plan is to develop a rigid disc product and commence sales in 1981. While the determination as to how to proceed with such development at the time of the hearing had not been made by Verbatim, its present intention is to select one of two license arrangements from either IBM or Dysan in order to obtain a dispersion formulation for its rigid disc product.

the fragile interrelationship between the ingredients or materials (particularly the magnetic particles), the chemical formulas of the constituents of the dispersion, and the manufacturing process. In effect, Verbatim's argument amounts to an assertion that should Kirkevold disclose 3M's confidential information to Verbatim, Verbatim could not apply that information in a way which would economically enable Verbatim to duplicate 3M's rigid disc product because Verbatim lacks access to the materials, or knowledge of the contents of the materials, used in 3M's dispersion formulation.

Defendants' argument that Verbatim's inability to use 3M's confidential information establishes that 3M cannot be injured must be rejected for a number of reasons. First, any disclosure of the information at issue here can reasonably be expected to provide a link in the chain of Verbatim's technical knowledge which heretofore has not been known or appreciated. In this regard, the acquisition of such knowledge by Verbatim can only tend to diminish the competitive advantage which the confidential character of the information provides to 3M, as the secrecy of 3M's property would be unveiled. Further, it is conceivable that Verbatim could benefit from the acquisition of this knowledge in a research and development sense should it decide in the future to produce a rigid disc product without the use of license arrangement. Second, defendants' argument is logically deficient, as it in effect contends that Verbatim should not be enjoined because it does not have a sufficient amount of 3M's confidential information with respect to the materials used in 3M's dispersion process to apply the confidential information possessed by Kirkevold should he disclose it. Implicit in defendants' argument, as Dr. Bate's testimony acknowledges, is that if Verbatim were to acquire more of 3M's confidential information with respect to ingredients, it could more effectively put confidential information acquired by Kirkevold to use in an economic sense. This incremental approach advocated by defendants undermines the principles prohibiting the disclosure of trade secrets and confidential information. Callman, *The Law of Unfair Competition Trademarks and Monopolies*, Volume 2, §§ 51, 51.1, 53.2(a), 53.3 (3d ed. 1968). Finally, assuming Verbatim is correct when it contends that it cannot put such information to use, it does not necessarily follow that because Verbatim cannot benefit, 3M is not possibly injured. Once secret information loses its confidential character, any advantage possessed by the proprietor over its competitors will in all probability be impaired as the information is disseminated in the marketplace.

The confidential information possessed by Kirkevold is of a sensitive nature and provides 3M with an advantage over its magnetic media competitors. Based on the Court of Appeals analysis of the issue of irreparable harm in *Modern Controls* and the reasons outlined above, the Court has determined that 3M has established a realistic threat of disclosure and use of its confidential information by virtue of Kirkevold's employment at Verbatim. Consequently, the plaintiff has made the requisite clear showing of possible irreparable injury. *Fennell v. Butler*, 570 F.2d 263 (8th Cir.), cert. denied, 437 U.S. 906, 98 S.Ct. 3093, 57 L.Ed.2d 1136 (1978).

■ In light of the Court's conclusion that the covenant not to compete contained in the 3M–Kirkevold employment agreement was reasonable under the circumstances and enforceable, it is apparent that defendant Kirkevold breached this employment agreement when he commenced his employment with Verbatim.[6] As 3M has made a clear showing of probable success on the merits and possible irreparable injury, it is entitled to a preliminary injunction which restrains Kirkevold from continued employment at Verbatim in accordance with the covenant not to compete contained in the 3M–Kirkevold employment agreement. *Modern Controls, Inc. v. Andreadakis*, 578 F.2d 1264 (8th Cir. 1978).

6. In this memorandum, the Court expresses no opinion on any of the other claims by any of the parties which remain as a part of this litigation.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff Minnesota Mining & Manufacturing Co. is entitled to a preliminary injunction under Federal Rule of Civil Procedure 65;

2. Defendant Kent A. Kirkevold, is hereby restrained and enjoined by this ORDER from:

   A. using or disclosing any confidential information or trade secrets which are the property of plaintiff which Kirkevold acquired by reason of his employment with plaintiff; and

   B. rendering services directly or indirectly to or for the defendant Verbatim Corporation until November 27, 1981, or order of this Court, whichever first occurs.

3. Defendant Verbatim Corporation, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with defendant Verbatim who receive actual notice of the order by personal service or otherwise, are hereby restrained and enjoined by this ORDER from:

   A. receiving, obtaining, using or disclosing any confidential information or trade secrets obtained from Kent A. Kirkevold which are the property of plaintiff; and

   B. accepting services directly or indirectly from Kent A. Kirkevold until November 27, 1981, or order of this Court, whichever first occurs.

4. Pursuant to the employment agreement between plaintiff and defendant Kirkevold, as well as commitments made by 3M at the hearing on this motion, plaintiff shall make the monthly payments to defendant Kirkevold as contemplated by the agreement, and said payments shall be made for the duration of the preliminary injunction irrespective of defendant Kirkevold's efforts to seek employment or any failure on his part to report to plaintiff. In the event that Kent A. Kirkevold obtains suitable employment during the pendency of this preliminary injunction, 3M may apply to the Court for an order which terminates its obligation to make the monthly payments to Kirkevold as contemplated by the employment agreement and this ORDER. The monthly payments required by the employment agreement and this ORDER shall be made by plaintiff to defendant Kirkevold beginning from the date of this ORDER and until the preliminary injunction expires, or until further order of this Court, whichever first occurs.

5. The parties shall confer on the question of whether a bond is necessary, and if so, in what amount. In the event of a disagreement, defendants may apply to the Court for an order requiring a bond to be posted by plaintiff.

---

Int. Chem. Div. - 3018
DIVISION OR SUBSIDIARY

53-6
EMPLOYEE'S LOCATION

3M COMPANY

# EMPLOYEE AGREEMENT

| Kirkevold, | Kent | A. |
|---|---|---|
| EMPLOYEE'S LAST NAME | FIRST NAME | INITIAL |

In this AGREEMENT, the following shall have the meanings shown:

1. 3M means Minnesota Mining and Manufacturing Company, St. Paul, Minnesota, and any of its existing or future subsidiaries.

2. CONFIDENTIAL INFORMATION means information, not generally known, about 3M's processes and products, including information relating to research, development, manufacture, purchasing, accounting, engineering, marketing, merchandising and selling.

3. **INVENTIONS** means discoveries, improvements and ideas (whether patentable or not) relating to any activities of 3M.

4. **CONFLICTING PRODUCT** means any product or process of any person or organization other than 3M, in existence or under development, which resembles or competes with a product or process upon which I work during the last two years of my employment by 3M, or about which I acquire CONFIDENTIAL INFORMATION through my work with 3M.

5. **CONFLICTING ORGANIZATION** means any person or organization which is engaged in, or about to become engaged in, research on or development, production, marketing or selling of a CONFLICTING PRODUCT.

## I AM EMPLOYED OR DESIRE TO BE EMPLOYED BY 3M IN A CAPACITY IN WHICH I MAY RECEIVE OR CONTRIBUTE TO CONFIDENTIAL INFORMATION; I THEREFORE AGREE:

A. With respect to INVENTIONS made or conceived by me, either solely or jointly with others, during (1) my employment or (2) within one year after termination of mv employment if based on CONFIDENTIAL INFORMATION;

    a. To promptly and fully inform 3M in writing of such INVENTIONS.

    b. To assign (and I do hereby assign) to 3M all of my rights to such INVENTIONS, and to Applications for Letters Patent and to Letters Patent granted upon such INVENTIONS.

    c. To acknowledge and deliver promptly to 3M (without charge to 3M but at the expense of 3M) such written instruments and to do such other acts as may be necessary in the opinion of 3M to obtain and maintain Letters Patent and to vest the entire right and title thereto in 3M.

B. EXCEPT as required in my duties to 3M, I will never use or disclose any CONFIDENTIAL INFORMATION.

C. UPON termination of my employment with 3M, all records of CONFIDENTIAL INFORMATION including copies thereof in my possession, whether prepared by me or others, will be left with 3M.

D. EXCEPT as listed on the back of this AGREEMENT, I will not assert any rights under any INVENTIONS as having been made or acquired by me prior to my being employed by 3M.

E. FOR a period of two years after termination of my employment by 3M:

    a. If I have been or am employed by 3M in a sales capacity, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in connection with the sale, merchandising or promotion of CONFLICTING PRODUCTS to any customer of 3M upon whom I called, or whose account I supervised on behalf of 3M, at any time during the last two years of my employment by 3M.

    b. If I have been or am employed by 3M in a non-sales capacity, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified, and which as to part of its business is not a CONFLICTING ORGANIZATION, provided 3M, prior to my accepting such employment, shall receive separate written assurances satisfactory to 3M from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly in connection with any CONFLICTING PRODUCT.

    If I am unable to obtain employment consistent with my training and education, solely because of provisions of this Paragraph E, such provisions shall bind me only as long as 3M shall make payments to me equal to my monthly base pay at termination (exclusive of extra compensation or employee benefits) for each month of such unemployment.

    I will, during each month of such unemployment for which I claim payment, give 3M a detailed written account of my efforts to obtain employment, and such account will include a statement by me that although I conscientiously sought employment, I was unable to obtain it solely because of the provisions of this Paragraph E.

    It is understood that 3M shall, at its option, be relieved of making a monthly payment to me for any month during which I have failed to account to 3M, as provided for above.

3M is obligated to make such payments to me, upon my fulfillment of the conditions set forth above for 24 consecutive months unless 3M gives me written permission to accept available employment, or gives me a written release from the obligations of Paragraph E.

3M's obligation to make such monthly payments shall terminate upon my obtaining employment, and I will promptly give written notice of such employment to 3M.

3M shall not be liable, under this AGREEMENT, or any action relating thereto, for any amount greater than the equivalent of 24 such monthly payments.

F. I AGREE that all my obligations under Paragraphs A through D of this AGREEMENT shall be binding upon my heirs, assigns, and legal representatives.

G. THE LAW of the State of Minnesota shall govern this AGREEMENT.

H. THIS AGREEMENT supersedes and replaces any existing Agreement entered into by me and 3M relating generally to the same subject matter.

DATED: _Feb. 24 - 1964_

_Kent A. Kuberoll_
EMPLOYEE'S SIGNATURE                                      (SEAL)

_2529 Central Ave. N E_
HOME ADDRESS

_Minneapolis        18,        Minnesota_
CITY                                    STATE

ACCEPTED FOR 3M THIS____28th____ DAY OF__February____ 19__64__.

SIGNATURE AND TITLE
Division Vice President
Chemical Division

**3M MINNESOTA MINING & MANUFACTURING CO.**
SAINT PAUL 19, MINNESOTA