586 F.Supp. 704 (1984)
SIGMA CHEMICAL COMPANY, Plaintiff,
v.
Foster HARRIS, Defendant.
No. 84-529C(1).
United States District Court, E.D. Missouri, E.D.
May 15, 1984.
*705 Alan C. Kohn, St. Louis, Mo., for plaintiff.
Theodore F. Schwartz, Clayton, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
This matter came before this Court on March 28, 1984, on plaintiff's application for a preliminary injunction, and this Court, *706 having conducted an evidentiary hearing on said date, having considered the briefs filed by the parties, and being fully advised in the premises, hereby enters the following Findings of Fact and Conclusion of Law.

A. FINDINGS OF FACT
1. Sigma Chemical Company (hereinafter "Sigma"), plaintiff herein, is a Missouri corporation having its principal place of business in the City of St. Louis, State of Missouri. Sigma is in the business of selling 16,000 esoteric chemicals used in research, production and analysis in laboratories, universities and hospitals all over the United States and in 140-160 foreign countries. It sells primarily by the use of a catalogue. Of these 16,000 chemicals, 10,000 are purchased from suppliers in the United States and all over the world. They are then analyzed, re-packaged in small units and sold. Purchases are made from 2,300 suppliers, many of whom are small "mom and pop" operations. The heart of Sigma's business is matching the right supplier with the product sold by Sigma. Although Sigma's suppliers send out catalogues and advertisements to many buyers, including Sigma's competitors, and although the chemicals and their names are in the public domain, Sigma's knowledge of which supplier sells a particular chemical of a certain quality that satisfies a particular purpose at the right price is not in the public domain. Sigma sells exotic chemicals used for advanced pharmaceutical research and for the detection and analysis of disease. The exact nature and constituent parts of the chemicals it sells are often unknown. For example, it purchases and then resells a certain constituent part of milk. While two or more suppliers may offer that item for sale, all but one of them have purified the chemical so well that the active ingredient used for research has also been purified out. The result is that Sigma uses only the one supplier which has not removed the one impurity that makes the product usable for research.
2. Foster Harris (hereinafter "Harris"), defendant herein, is a former employee of Sigma. Harris, formerly of St. Louis, Missouri, now resides permanently in Newport Beach, California. Harris was employed by Sigma as a purchasing agent or chemical buyer.
3. Sigma's purchasing information is kept primarily in product and other files in the purchasing department. While employed at Sigma, Harris had access to such information. Such information constitutes a trade secret and confidential information, because in the esoteric chemical mail order business the price that Sigma pays and the quality of a particular item, together with the identity of the seller for that price and that quality, is highly proprietary information. Moreover, said product information maintained by Sigma would be invaluable to a competitor and it would be extraordinarily difficult to reproduce the information that said files contain. It took Sigma over 40 years to produce said information at a significant cost.
Said information is kept guarded by several levels of security. First, there is only one entrance to the building where the purchasing department is located and that entrance is guarded by an armed guard 24 hours a day, 7 days a week. Further, each employee must wear an identification badge with his or her photograph on it. The badge is colorcoded by Sigma so that it is obvious if an employee is in the wrong department. Materials are not supposed to be removed from the purchasing department and visitors cannot enter except if necessary and if escorted by an employee who has identified the visitor at the front entrance. These procedures are adequate to safeguard Sigma's purchasing information.
4. Sigma has five major competitors, one of which is ICN. ICN lists Sigma in its 1982 Annual Report as one of its competitors. Sigma closely watches what its competitors are doing and keeps their catalogues on a computer for product and price comparisons. Sigma's suppliers include, inter alia, Pharmachemique and Lab Plan. Sigma has an exclusive arrangement with Lab Plan.
*707 5. The President of Sigma and other critical employees in the company have signed non-compete contracts. Those signing contracts who have left Sigma have not had difficulty obtaining other employment at chemical companies, pharmaceutical companies, laboratories, universities, and bio-technology companies.
6. Defendant Foster Harris testified by deposition. Defendant is 37 years old and was born in Arkansas. He obtained a B.A. in Biology and Chemistry from the University of Missouri in St. Louis in 1969 and an M.A. in Economics in 1978 from Webster University.
7. In 1969, Harris went to work for Washington University School of Medicine doing basic biochemical research. His title was research technician and later research assistant. He did unidirectional flux studies. From 1972 to 1979 he continued doing the same work but at Jewish Hospital. He also took on the additional duties of training technical personnel and medical students.
8. On December 3, 1979, Harris went to work for Sigma and signed a non-competition agreement at that time. He signed another one on September 24, 1982. The latter contract provided that defendant:
shall not, directly or indirectly (whether as owner, partner, consultant, employee or otherwise) ... for a period of two years following termination for any reason of my employment with the Company engage in or contribute my knowledge to any work or activity that involves a product ... which is then competitive with and the same or similar to a product ... on which I worked or with respect to which I had access to Confidential Information while with the Company.
The contract further provided, as follows:
Following expiration of said two year period I shall continue to be obligated under the "confidential information" section of this agreement not to use or to disclose confidential information so long as it shall remain proprietary or protectable as confidential trade secret information.
9. Harris worked for Sigma from 1979 until November 22, 1983, when he resigned. His starting salary was $15,500 and was gradually increased to $23,500. He spent the majority of his time buying esoteric chemicals for Sigma. He was given a stock status list of around 700 items to work from. It showed the inventory on hand and if there were less than 26 weeks of supply he would buy the item. After identifying the chemical for purchase on his stock status list, he went to the product folder for the item. This folder gives the entire purchasing history for the product, including the suppliers, the prices, the quantities bought in the past, previous purchase orders, any comments about manufacturing or other problems, and test reports on the purity, appearance and salability of the product from Sigma's quality control laboratory.
10. If defendant needed the names of more potential suppliers of the chemical, he had available a Vendor Index Book which he kept current and which listed categories of products and the names of suppliers for those categories. He used this book as a tool to become a good buyer but actually he knew the whole book in his head. Defendant stated he was the "best source there" at Sigma and other buyers consulted him for the names of suppliers of chemicals which were on their own stock purchase lists.
11. From the Vendor Index Book, Harris would go to Vendor Files for each vendor to determine if the vendor sold the product to be purchased. In doing his work, defendant determined whether certain suppliers were manufactures or brokers, a fact he learned usually by the price being charged.
12. After obtaining vendors for the chemical, Harris called them and obtained price quotes and availability. He determined whether the price quoted was in line and, resorting to his cathode ray screen, determined Sigma's selling price. If the quoted price from the supplier was higher than in the past, he would notify the competition *708 department and recommend that Sigma make a corresponding increase in Sigma's price.
13. Harris also had additional responsibilities with regard to all products imported from foreign suppliers. He gave each such product the proper tariff number and "quite a bit" of the time, he would learn the name of the foreign supplier and its price. This, of course, included products not on his stock status list. He also purchased raw materials for Sigma's plant use and, finally, he did research for new chemicals to add to Sigma's catalogue. In the latter connection, he added labetatol and he "introduced tagamet [also known as cimetidine] to the research world."
14. After becoming dissatisfied with Sigma, Harris started sending out resumes to pharmaceutical companies, such as Boots, and chemical companies, such as Upjohn. Neither Boots nor Upjohn is in competition with Sigma. He also sent a resume to a subsidiary of McDonnell-Douglas, named Vitek, which is not in competition with Sigma. He took a job with ICN as purchasing agent. He admitted that when he left he lied to Sigma about where he was going. He told his supervisor, John Haynes, that he was going to work for a friend who owned Afram, a company that imports from and exports to third world countries. He did "not really" believe it was any of Sigma's business where he was going. He did not tell ICN of the non-compete agreement when he went there to work.
15. At ICN, Harris presently buys chemicals and radioisotopes for its division in California and coordinates purchases for ICN Nutritional Biochemicals in Cleveland, ICN KOR in Cambridge, Massachusetts, and ICN Schwartzman, also in Cambridge. His office is in California but before going there, he visited ICN in Cleveland for two weeks, and spent 2-3 days at ICN KOR and ICN Schwartzman.
16. While in Cleveland, Harris talked to ICN buyers Beatty and Wilcox about sources and strategies regarding employment of dealers. Harris discussed Sigma supplier Pharmachemique with Beatty who said he had never tried Pharmachemique before because he had not thought of it. Harris tried to buy casein for ICN from Pharmachemique and discussed using Pharmachemique as a source of supply with his boss, Fred Andrea. Harris tried to buy bilirubin for ICN from Lab Plan, a Sigma exclusive supplier he used when he worked for Sigma. At ICN KOR, he talked to buyers Bob Capadeche and Joe Fontana about sources.
17. After visiting the ICN divisions in the east, Harris returned to California to purchase chemicals and coordinate the purchase of chemicals. His ICN Cleveland and ICN Schwartzman catalogues were close at hand and the ICN KOR catalogue was also available. At ICN, he is responsible for the purchase of 2,000-3,000 chemicals and there is a "significant" overlap between those products and the 700 products in his Sigma stock status list. ICN sells biochemicals, deuterated isotopes, and ultra pure products and so does Sigma. Harris keeps in contact with ICN Cleveland, ICN KOR, and ICN Schwartzman by telephone and telex.
18. Sigma introduced into evidence a December 14, 1983, telex from Harris, while at ICN Cleveland, to Pharmachemique requesting price and availability of the chemical casein; a January 17, 1984, telex from ICN Cleveland's Beattie to Pharmachemique requesting price and availability of glycotaurocholic acid; a February 6, 1984, telex from ICN Cleveland's Wilcox to Pharmachemique ordering thyrothericine; an ICN purchase order to Pharmachemique for thyrothericine; and a February 7, 1984, telex from Lab Plan to Sigma addressed to Harris and advising that it had no bilirubin. Thus, it can be inferred that Harris is already using for ICN some of the proprietary information he learned at Sigma.
19. ICN Cleveland sells 2,425 products which are also sold by Sigma and 163 of these were on Harris' stock status list. ICN Schwartzman sells 92 products which are also sold by Sigma and 4 of those were *709 on Harris' stock list. ICN KOR sells 89 products which are also sold by Sigma but none was on Harris' stock status list. No comparison of Sigma with ICN California was made because ICN California does not currently have a catalogue. Sigma and ICN are keen competitors and Harris is in a position to use Sigma trade secrets and confidential information learned at Sigma to aid ICN.

B. CONCLUSIONS OF LAW
This matter was properly removed from state court. Plaintiff Sigma and defendant Harris are of diverse citizenship and the amount in controversy exceeds $10,000.00 exclusive of costs and interest. See Findings of Fact Nos. 1 and 2.
This is an action by Sigma, defendant's former employer, against defendant alleging that defendant breached his employment contract, specifically the restrictive covenant contained therein, with Sigma. Plaintiff seeks a preliminary injunction enjoining defendant from rendering services to ICN and using or disclosing trade secrets or other confidential information of plaintiff's learned by defendant during his employment with Sigma.
The standard which guides this Court in determining whether a preliminary injunction should issue was articulated by the Eighth Circuit in Dataphase Systems, Inc. v. C.L. Systems, Inc., 640 F.2d 109 (8th Cir.1981), as follows:
(1) whether there is a substantial probability movant will succeed at trial; (2) whether the moving party will suffer irreparable injury absent the injunction; (3) the harm to other interested parties if the relief is granted; and (4) the effect on the public interest.
Id. at 112. See also Local Cartage Association v. Highway, City and Air Freight Drivers, 574 F.Supp. 1573, 1580 (E.M.Mo. 1983). In the opinion of this Court, application of these factors to the facts of this case warrants issuance of a preliminary injunction.

1. Likelihood Of Success On Merits
The first factor, likelihood of success on the merits, is the most significant legal issue in this case because the majority of defendant's arguments go to the validity of the restrictive covenant. The benchmark in determining the validity of a restrictive covenant is whether it is reasonable. Orchard Containers Corp. v. Orchard, 621 S.W.2d 299, 303 (Mo.App.1980). Reasonableness has three (3) components: 1) the restrictive covenant must be reasonably necessary to "protect certain narrowly defined and well recognized interests against appropriation by former employees ..., viz: trade secrets and stock of customers," Orchard, 621 S.W.2d at 303; 2) the covenant must be reasonable in terms of temporal scope; and 3) the covenant must be reasonable in terms of geographic scope.
Defendant first argues that the restrictive covenant is invalid and unenforceable because Sigma does not have a legitimate interest to protect, i.e., trade secrets. Missouri courts have adopted § 575 of the Restatement of Torts to define the term "trade secrets", as follows:
[A]ny formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business ... in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid ....
The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret .... Some factors to be considered in determining whether given information is one's trade secret are: (1) *710 the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
Continental Research Corp. v. Scholz, 595 S.W.2d 396, 400-01 (Mo.App.1980), quoting National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 18-19 (Mo. Banc 1966). See also Metal Lubricants Company v. Engineered Lubricants Co., 284 F.Supp. 483 (E.D.Mo.1968).
In the opinion of this Court, the information which plaintiff seeks to protect is trade secret information. See Findings of Fact Nos. 1 and 3. It matters not that Sigma utilizes sellers' catalogues and other information that is in the public domain. Sigma's knowledge of which supplier can provide the right chemical for a particular use at the right price is based upon years of experience and testing by Sigma, and said knowledge is not in the public domain. See Finding of Fact No. 3. Moreover, this Court is satisfied that Sigma has taken adequate steps to keep its purchasing knowledge secret. See Finding of Fact No. 3. Therefore, Sigma has a legitimate interest which can be protected by a reasonable restrictive covenant.
To be valid, the terms of the restrictive covenant must satisfy both temporal and geographical reasonableness. Here, the covenant prohibits employment with competitors for two (2) years. See Finding of Fact No. 8. This is a reasonable time limit. However, defendant points to the covenant not to reveal trade secrets and argues that, in fact, there is no time limit. This argument lacks merit because an employee has an absolute, temporally unlimited duty not to disclose his/her employer's trade secrets and thus the absence of a time limit is not a defect. Nucor Corp. v. Tennessee Forging Steel Service, Inc., 476 F.2d 386 (8th Cir.1973).
With respect to the geographical scope of the restriction on employment with competitors, there is no limit. See Finding of Fact No. 8. Defendant is prohibited from working for a competitor for two (2) years worldwide. The test for reasonableness of geographic scope is whether it is "no greater than fairly required for protection." Continental Research Corporation v. Scholz, 595 S.W.2d 396, 400 (Mo.App.1980). See also Prentice v. Rowe, 324 S.W.2d 457, 461 (Mo.App.1959). There is no requirement that a restrictive covenant have some geographic limit to be valid. The requirement is that the geographic scope be reasonable.
In this case, worldwide application of the restrictive covenant is necessary to protect Sigma's interests. Both Sigma and its competitors operate on a worldwide basis. See Finding of Fact No. 1. Therefore, the covenant is also reasonable in terms of geographic scope. See Mills v. Murray, 472 S.W.2d 6, 11 (Mo.App.1971) (restrictive covenant valid despite absence of a geographical limitation).
Accordingly, the restrictive covenant in this case is valid and enforceable. Because defendant is working for a competitor, and thus violating the restrictive covenant, there is a strong probability that plaintiff will succeed on the merits.

2. Threat of Irreparable Injury
Defendant argues that this requirement has not been met because there has been no proof that defendant has in fact damaged plaintiff. However, plaintiff need only show that there is a threat of irreparable harm if the preliminary injunction does not issue and this plaintiff has proven. Defendant is now in a position to injure plaintiff and the potential injury would be irreparable. See Findings of Fact Nos. 15-18. See Haysler v. Butterfield, 218 S.W.2d 129 (Mo.App.1949). Moreover, the facts that defendant attempted *711 to mislead plaintiff about his new employment, see Finding of Fact No. 14, and has solicited some of plaintiff's suppliers in the course of working for ICN, see Findings of Fact Nos. 15-18, strongly suggests a threat of harm to plaintiff. See Modern Controls, Inc. v. Andreadakis, 578 F.2d 1264, 1270 (8th Cir.1978); Minnesota Mining and Manufacturing Co. v. Kirkevold, 87 F.R.D. 324, 327 (D.Minn. 1980); Mixing Equipment Co. v. Philadelphia Gear, Inc., 312 F.Supp. 1269 (E.D.Pa. 1970).

3. Harm To Defendant If Preliminary Injunction Granted
Defendant argues that a balance of the equities and potential harm favor denial of a preliminary injunction. However, the equities do not favor defendant due to the evidence that defendant's breach of the restrictive covenant was willful and that defendant fraudulently attempted to conceal his breach. See Finding of Fact No. 14. Moreover, the harm to defendant is slight when compared to the potential harm to plaintiff. Plaintiff stands to lose part of a competitive edge that has taken over forty (40) years to develop, whereas defendant has a wide market of job opportunities with companies that do not compete with plaintiff. See Findings of Fact Nos. 5-7.

4. The Public Interest
The final factor is whether the public interest supports the issuance of a preliminary injunction. Here, the public interest in protecting valid trade secret information and enforcing valid employment contracts justifies preliminary injunctive relief.
For the foregoing reasons, a preliminary injunction is entered this day enjoining defendant from working for ICN or otherwise disclosing plaintiff's trade secrets.