605 F.Supp. 1253 (1985)
SIGMA CHEMICAL COMPANY, Plaintiff,
v.
Foster HARRIS, Defendant.
No. 84-529C(1).
United States District Court, E.D. Missouri, E.D.
April 3, 1985.
On Motion to Alter or Amend April 30, 1984.
*1254 Alan C. Kohn, St. Louis, Mo., for plaintiff.
Theodore F. Schwartz, Clayton, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
This case was tried to this Court sitting without a jury. This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

A. FINDINGS OF FACT
1. Sigma Chemical Company (hereinafter "Sigma"), plaintiff herein, is a Missouri corporation having its principal place of business in the City of St. Louis, State of Missouri. Sigma is in the business of selling 16,000 esoteric or fine chemicals used in research, production and analysis in laboratories, universities and hospitals all over the United States and in 140-160 foreign countries. It sells primarily by the use of a catalogue. Of these 16,000 chemicals, 10,000 are purchased from suppliers in the United States and all over the world. The remaining 6,000 are manufactured by Sigma. The items purchased by Sigma for resale are analyzed upon receipt, re-packaged in small units and then sold. Purchases are made from 2,300 suppliers, many of whom are small "mom and pop" operations. The heart of Sigma's business is matching the right supplier with the product sold by Sigma. Although Sigma's suppliers send out catalogues and advertisements to many buyers, including Sigma's competitors, and although the chemicals and their names are in the public domain, Sigma's knowledge of which supplier sells a particular chemical of a certain quality that satisfies a particular purpose at the right price is not in the public domain. The chemicals sold by Sigma are often used for advanced pharmaceutical research and for the detection and analysis of disease. The exact nature and constituent parts of the chemicals it sells are often unknown. For example, it purchases and then resells a certain constituent part of milk. While two or more suppliers may offer that item for sale, all but one of them have purified the chemical so well that the active ingredient used for research has been purified out. The result is that Sigma uses only the one supplier which has not removed the one impurity that makes the product usable for research.
2. Foster Harris (hereinafter "Harris"), defendant herein, is a former employee of Sigma. Harris, formerly of St. Louis, Missouri, now resides permanently in California. Harris was employed by Sigma as a purchasing agent or chemical buyer.
3. Sigma employs approximately 900 individuals. Approximately 100 of these indivduals *1255 are employed in the quality control department. Sigma analyzes or assays every chemical or shipment of chemicals that it purchases. Each chemical is subjected to nine different tests to determine whether it complies with the seller's specifications, Sigma's standards and the needs of Sigma's customers. Sigma even tests new shipments from previously tested lots. On the average, Sigma rejects approximately 15% of the items that it purchases because said items fail to meet the seller's, Sigma's, or the customer's specifications. Sigma frequently does not return rejected products, especially where a rejected product was purchased from a competitor, because they do not wish to advise its suppliers of what is wrong with their products. Jerry Annunciato, Manager of K & K Chemicals, testified that his firm does not do any quality testing of the chemicals that it sells and that he occasionally receives complaints from customers. Thus, although a seller's catalogue will contain a statement of the chemical's specifications and a certificate of analysis which may accompany the chemical purchased, the product does not always meet either the seller's catalogue's specifications or the certificate of analysis.
4. Sigma deals with approximately 2,300 suppliers. However, there are literally thousands of potential suppliers and there is often more than one supplier for many items. Quality is a major criteria in choosing a particular supplier for a particular product. This is one of the reasons that Sigma employs a significant proportion of its work force in the area of quality control. One of the keys to Sigma's success has been its ability to sell chemicals which are high in quality and which satisfy its customers' sometimes specific needs.
5. The President of Sigma, Dr. Thomas Cori, testified that finding the supplier who can supply a particular chemical with particular quality attributes at a particular price is akin to "finding a needle in a haystack". This Court credits Dr. Cori's testimony.
6. Sigma maintains a great deal of information about the products that it purchases for resale. This information is kept primarily in product files and vendor files. These files are maintained in the purchasing department at Sigma. These files have been developed by Sigma over a period of 40 years at a significant cost. A typical product file contains the name of the product, information regarding Sigma's source or sources for that product, quality control testing information, price and purchasing history information, and complaints, if any, from customers. A typical vendor file consists of the supplier's name, and price and quality information regarding products purchased from that vendor. Some of the individual items in these files are in the public domain. For example, many files contain excerpts from suppliers' published catalogues and sales materials. The knowledge of which supplier's catalogue is in a particular product is not in the public domain. The files also contain other information that is not public and is, in fact, kept secret. The types of information that are secret include the following: 1) Sigma's particular source for a particular product; 2) the negotiated price that Sigma pays for a particular product; 3) the results of Sigma's quality control tests, i.e., which supplier's products fail to meet Sigma's specifications; 4) the quantities in which plaintiff purchases particular products; and 5) sales and purchasing history for a given product.
7. Taken as a whole, the information maintained by Sigma in its product and vendor files constitutes confidential and highly valuable proprietary information. Sigma has approximately 60 to 70 competitors in the fine and esoteric chemical business. Sigma and its competitors are inundated with suppliers' marketing information on a daily basis. One of defendant's witnesses, Jerry Annunciato, testified that abstracting such information is a full time job. Mr. Annunciato testified that his firm, K & K Laboratories, a division of ICN, has developed an index consisting of 200,000 3" × 5" cards, which index relates to potential sources of chemicals, and that it has taken 27 years to compile said index. Moreover, *1256 the primary basis of competition between Sigma and its competitors is price and quality. Success is based in large part on a competitor's ability to determine which supplier, among many, provides an item of a particular quality at the right price. The identity of the seller for that price and that quality is valuable to a competitor in Sigma's business. Two (2) of defendant's witnesses, Jerry Annunciato and Robert Beatty, an officer with ICN Cleveland, a major competitor of Sigma, testified that they maintain the confidentiality of the price paid by their respective firms to their suppliers and the identity of their firms' respective suppliers and would not divulge said information to one of their competitors. Thus, Sigma's competitors treat such information as valuable. This Court also credits Dr. Cori's testimony that Sigma's competitors do not keep records as detailed or as complete as Sigma does. This Court also credits Dr. Cori's testimony that prior price and purchasing information can be useful in price negotiations and that Sigma negotiates nearly all of the prices that it pays for the products that it purchases. The confidential product and vendor files maintained by Sigma would be valuable to a competitor and would be extremely difficult to reproduce, given the number of items that Sigma offers and the large volume of supplier information that exists.
8. Sigma takes several measures to guard and maintain the confidentiality and secrecy of the information contained in its product and vendor files. First, there is only one entrance to the building where the purchasing department is located and that entrance is guarded by an armed guard 24 hours a day, seven days a week. Second, each employee must wear an identification badge with his or her photograph on it. The badges are colorcoded by department so that it is obvious if an employee is in a department where he or she is not authorized to be. Third, said files are not supposed to be removed from the purchasing department. Fourth, visitors may not enter the purchasing department, unless escorted by an authorized employee who has identified said visitor at the front entrance.
Several former and current Sigma employees testified that they seldom wore their identification badges subsequent to entering the building. However, these employees were authorized to have access to the product and vendor files. Moreover, there was no evidence that Sigma's alleged failure to strictly enforce the identification badge rule ever resulted in unauthorized personnel gaining access to Sigma's confidential information. In addition, there was testimony that Sigma reveals certain information to shippers, airlines, and customs officials in the course of shipping and receiving the products that Sigma purchases. The information revealed thereby is limited to the name of the product and the name of the vendor. However, this does not warrant a finding that Sigma's product and vendor information is not kept secret. Much of the information which is not proprietary is never revealed to persons involved with shipping or receiving, such as purchasing history of a given product, testing results, frequency of purchases, and any complaints from customers. Also, shippers and customs officials are exposed to only isolated examples of Sigma's proprietary information and these individuals probably lack the requisite chemical experience and knowledge to use said information to compete with plaintiff. There was no evidence that any of plaintiff's competitors have ever received Sigma's proprietary information from shippers or customs officials. The confidentiality of Sigma's proprietary information is also not lost by the fact that it purchases some of its products from competitors. When Sigma purchases a product from a competitor, that competitor obviously knows Sigma's source and price for that product. However, that competitor does not know for sure that the product being offered for resale by Sigma is, in fact, the product that that competitor sold to Sigma. The product sold by that competitor may fail Sigma's quality criteria and that competitor may never learn this. Also, that competitor's knowledge is obviously limited to the products that it sells to Sigma. The value of Sigma's proprietary *1257 information lies in having access to the sum total of its product and vendor files and a single competitor's knowledge of the source and price of a few of Sigma's 10,000 purchased products does not detract from the confidentiality of the whole.
The procedures and precautions taken by Sigma to safeguard the confidentiality and secrecy of the information contained in its product and vendor files are both adequate and reasonable.
9. The President of Sigma and other critical employees are required to sign non-compete and non-disclosure contracts. In determining which employees will be required to sign such contracts, Sigma officials make a judgment as to the threat that an individual employee might pose to Sigma if he or she were exposed to Sigma's confidential proprietary information. This Court credits the testimony of Dr. Cori and John Haynes, Purchasing Manager for Sigma, that because of the technical and complex nature of the fine chemical business, only employees with significant experience or educational background in the chemical field pose a serious threat to Sigma through the use of Sigma's confidential proprietary information. Employees, such as defendant, who had a chemical background and who worked with a large number of files on a daily basis could absorb enough information about Sigma's sources of supply to harm plaintiff's competitive position. Sigma did not require certain hourly employees, many of whom had little more than a high school education and who occasionally worked with or had access to Sigma's product and vendor files, to sign non-compete and non-disclosure contracts. This Court credits Sigma's judgment that these types of employees could neither absorb nor understand the information contained in plaintiff's product and vendor files in such a way as to harm plaintiff or destroy the confidential nature of such information. There was no evidence that Sigma's failure to require such employees to sign non-compete and non-disclosure contracts ever resulted in misappropriation or misuse of Sigma's confidential proprietary information. Sigma has sought to protect the confidentiality of its proprietary information by enforcing its non-compete and non-disclosure agreements against employees bound thereby after they have left employment with Sigma and where necessary to protect Sigma's interests.
10. Sigma's employees who have signed non-compete and non-disclosure contracts and who have left Sigma have not had difficulty obtaining other employment at chemical companies, pharmaceutical companies, laboratories, universities and bio-technology companies. Sigma and its competitors operate and compete on a worldwide basis.
11. The only Sigma employees who had regular and frequent access to its product and vendor files were those in the purchasing department and the competition department. The purchasing department consists of 18 employees. The competition department consists of 10 employees. Ten (10) of the employees in the purchasing department are buyers and all of them have non-compete and non-disclosure contracts. Eight (8) of the employees in the purchasing department do not have non-compete and non-disclosure contracts, but only one of these has any significant buying responsibilities and, due to that employee's limited education, does not pose a threat to plaintiff.
12. Defendant Foster Harris is 37 years old and was born in Arkansas. He obtained a B.A. in Biology and Chemistry from the University of Missouri in St. Louis in 1969 and an M.A. in Economics in 1978 from Webster University. Prior to working for Sigma, Harris worked for Washington University School of Medicine doing basic biochemical research for three years and did similar work at Jewish Hospital for seven years.
13. On December 3, 1979, Harris went to work for Sigma and signed a non-competition and non-disclosure agreement at that time. He signed another such agreement on September 24, 1982. According to the latter contract, defendant agreed that he would not:

*1258 directly or indirectly (whether as owner, partner, consultant, employee or otherwise) ... for a period of two years following termination for any reason of [his] employment with the Company engage in or contribute [his] knowledge to any work or activity that involves a product ... which is then competitive with and the same or similar to a product ... on which [he] worked or with respect to which [he] had access to Confidential Information while with the Company.
By the latter contract, he further agreed that:
Following expiration of said two year period [he would] continue to be obligated under the "confidential information" section of this agreement not to use or to disclose confidential information so long as it shall remain proprietary or protectable as confidential trade secret information.
14. Harris worked for Sigma from 1979 until November 22, 1983, when he resigned. His starting annual salary with Sigma was $15,500.00 and was gradually increased to $23,500.00. He spent the majority of his time buying esoteric and fine chemicals for Sigma. He was given a stock status list of around 700 items to work from. Said list showed the inventory on hand for a particular item and if there were less than 26 weeks of supply on hand he would buy that item. After identifying the chemical for purchase on his stock status list, he would go to the product folder for that item. This folder provided Harris with the entire purchasing history for that product, including the suppliers, the prices, the quantities bought in the past, previous purchase orders, any comments about manufacturing or other problems, and test reports on the purity, appearance and salability of the product from Sigma's quality control laboratory.
15. If Harris needed the names of more potential suppliers of the product, he had available a vendor index book which he kept current and which listed categories of products and the names of suppliers for those categories. Harris developed this book. He testified that he used this book so frequently that he had its entire contents memorized. Defendant has stated that he was the "best source person" at Sigma and that other buyers consulted him for the names of suppliers of chemicals which were on their own stock purchase lists. Harris testified that when he left Sigma, the vendor index book was fresh in his mind.
16. From the vendor index book, Harris would go to vendor files for each vendor to determine if that vendor sold the product to be purchased. In doing his work, defendant determined whether certain suppliers were manufacturers or brokers, a fact he usually learned by the price being charged.
17. After obtaining vendors for the chemical, Harris called them and obtained price quotes and availability. He determined whether the price quoted was appropriate and, resorting to his cathode ray screen, determined Sigma's selling price. If the quoted price from the supplier was higher than in the past, he would notify the competition department and recommend that Sigma make a corresponding increase in Sigma's price.
18. Harris had additional responsibilities with regard to all products imported from foreign suppliers. He gave each such product the proper tariff number and "quite a bit" of the time, he learned the name of the foreign supplier and its price. This, of course, included products not on his stock status list. He also purchased raw materials for Sigma's plant use and, finally, he did research for new chemicals to add to Sigma's catalogue. In the latter connection, he added labetatol to Sigma's catalogue and he "introduced tagamet [also known as cimetidine] to the research world."
19. After becoming dissatisfied with Sigma, Harris started sending out resumes to pharmaceutical companies, such as Boots, and chemical companies, such as Upjohn. Neither Boots nor Upjohn is in competition with Sigma. Harris also sent a resume to a subsidiary of McDonnell Douglas, named "Vitek", which is not in competition *1259 with Sigma. Harris also sent a resume to ICN. ICN is one of Sigma's five (5) major competitors and ICN lists Sigma in ICN's 1982 annual report as one of its competitors.
20. Harris accepted a job with ICN as a purchasing agent and began employment on November 29, 1983. Prior to leaving Sigma, Harris lied about the identity of his future employer. Harris told his supervisor, John Haynes, that he was going to work for a friend who owned Afram, a company that imports from and exports to third world countries. However, the September 24, 1983, non-compete agreement between Sigma and Harris obligated Harris to "advise the Company of [his] new employer within ten days after accepting new employment." Harris did not tell ICN about his non-compete and non-disclosure agreement with Sigma when he went to work for ICN.
21. When Harris went to work for ICN, he was required to sign an agreement in which he promised not to disclose "confidential information, trade secrets, technical data or know how which [he] may acquire while in the employment of ICN".
22. Defendant's office with ICN was to be at its division in California. However, prior to going there he traveled to ICN in Cleveland for two weeks, and spent two-three days at ICN KOR and ICN Schwartzman. While in Cleveland, Harris talked to ICN buyers Beatty and Wilcox about sources of supply and strategies regarding employment of dealers. Harris discussed Sigma supplier Pharmachemique with Beatty, who said he had never tried Pharmachemique before because he had not thought of it. While in Cleveland, Harris tried to buy casein for ICN from Pharmachemique and discussed using Pharmachemique as a source of supply with his boss, Fred Andrea. Harris also tried to buy bilirubin for ICN from Lab Plan, a Sigma exclusive supplier he used when he worked for Sigma. At ICN KOR, he talked to buyers Bob Capadeche and Joe Fontana about sources.
23. After visiting the ICN divisions in the east, Harris returned to California. Defendant's job duties include buying chemicals and radioisotopes for ICN's division in California and coordinating purchases for ICN Nutritional Biochemicals in Cleveland, Ohio, ICN KOR in Cambridge, Massachusetts, and ICN Schwartzman, also in Cambridge. At ICN, Harris is responsible for purchasing approximately 3,000 chemicals and there is a significant overlap between those products and the 700 products that Harris was responsible for at Sigma. Harris keeps in regular contact with ICN Cleveland, ICN KOR and ICN Schwartzman by telephone and telex. ICN Cleveland sells 2,425 products which are also sold by Sigma and 163 of these were on Harris' stock status list at Sigma. ICN Schwartzman sells 92 products which are also sold by Sigma and 4 of these were on Harris' stock status list at Sigma. ICN KOR sells 89 products which are also sold by Sigma but none of these were on Harris' stock status list at Sigma. ICN California does not currently have a catalogue.
24. Sigma and ICN are keen competitors and Harris is in a position to use Sigma trade secret and confidential information learned at Sigma to aid ICN.
25. On May 15, 1984, this Court ordered Harris not to render services "directly or indirectly to or for ICN Pharmaceuticals, Inc., until November 22, 1985...." See 586 F.Supp. 704. On May 17, 1984, Harris requested a quote by ICN telex from Konig and Company with respect to a particular chemical. Konig and Company is a firm that Harris dealt with during his employment at Sigma.
26. On June 1, 1984, ICN Cleveland published a catalogue containing 230 items. Of these, 151 items had been previously listed by ICN and 31 of these 151 items were on defendant's stock status list at Sigma. There were 79 items in this catalogue which had not been previously listed by ICN. Of these 79, 39 items were on defendant's stock status list at Sigma.
27. Defendant's salary with ICN was $32,500.00 per year.
*1260 28. On June 1, 1984, Harris signed a promissory note to ICN in the principal amount of $50,000.00 at 10% interest payable quarterly. ICN, however, did not pay that amount to Harris. Instead, it allowed Harris to draw $1,000.00 every two weeks. At the time of trial, Harris had drawn over $8,000.00 from ICN, but it failed to make the quarterly interest payment when due.

B. CONCLUSIONS OF LAW
This Court has subject matter jurisdiction because the parties are of diverse citizenship and the amount in controversy exceeds $10,000.00, exclusive of costs and interest. See Findings of Fact Nos. 1 and 2; 28 U.S.C. § 1332. This is an action by Sigma, defendant's former employer, to obtain permanent injunctive relief against defendant's alleged breach of the restrictive covenant and non-disclosure agreement in his employment contract with Sigma. The primary legal issues in this case are whether the restrictive covenant is valid and enforceable and whether Sigma is entitled to permanent injunctive relief.

1. Validity of Restrictive Covenant
The benchmark in determining the validity of a restrictive covenant is whether it is reasonable. Orchard Containers Corp. v. Orchard, 601 S.W.2d 299, 303 (Mo.Ct.App.1980). "Missouri law recognizes that a temporally and spatially limited restraint on an employee's ability to compete with his former employer will be enforced in equity if reasonable under all of the attending circumstances and if enforcement serves the employer's legitimate protectible interest." Mo-Kan Central Recovery Co. v. Hedenkamp, 671 S.W.2d 396, 399 (Mo.Ct.App.1984). Thus, reasonableness has three (3) components: 1) the covenant must be reasonably necessary to protect the employer's legitimate interest; 2) the covenant must be reasonable in terms of temporal scope; and 3) the covenant must be reasonable in terms of geographic scope. Orchard, 601 S.W.2d at 303.
The covenant in the case at bar prohibits employment with competitors for two (2) years, but does not contain an express geographical limitation. See Findings of Fact No. 13. Two (2) years is a reasonable time limitation and defendant does not seriously argue to the contrary. However, defendant argues that the restrictive covenant, which effectively prohibits defendants from working for a competitor for two (2) years anywhere in the world, is invalid because it is not reasonably limited to any territory of competition. See National Motor Club of Missouri v. Noe, 475 S.W.2d 16, 22 (Mo.1972). Defendant's reliance on Noe is misplaced because Noe is factually distinguishable from the case at bar. Unlike the employer in Noe, Sigma both buys and sells its products on a worldwide basis. See Findings of Fact Nos. 1 and 10. In addition, Sigma's major competitors compete with it on a worldwide basis. See Findings of Fact No. 10. The test for the reasonableness of the geographic scope of a restrictive covenant is whether it is "no greater than fairly required for protection." Continental Research Corporation v. Scholz, 595 S.W.2d 396, 400 (Mo.Ct.App.1980). See also Prentice v. Rowe, 324 S.W.2d 457, 461 (Mo.Ct. App.1959). The restrictive covenant in the case at bar is valid, despite the absence of a specific limit on its geographical scope, because Sigma's need for protection covers the face of the earth. Although it is not on point, the case of Mills v. Murray, 472 S.W.2d 6, 11 (Mo.Ct.App.1971), supports this Court's conclusion that Sigma's restrictive covenant is reasonable in terms of its geographic scope. Mills v. Murray, 472 S.W.2d 6, 11 (Mo.Ct.App.1971) (restrictive covenant valid despite absence of a geographical limitation). Accordingly, the temporal and geographical scope of Sigma's restrictive covenant passes muster under the reasonableness test.
Whether Sigma has a legitimate interest to protect is the third and final prerequisite to enforceability of Sigma's restrictive covenant and is the primary source of combat in this case. In the area of restrictive covenants, "Missouri courts limit the granting of equitable protection to *1261 two narrowly defined classes of employer interest, customer contacts and trade secrets, ...." Hedenkamp, 671 S.W.2d at 399 (citations omitted). Sigma claims that its product and vendor files constitute trade secrets and, therefore, warrant the protection of a restrictive covenant.
Missouri courts have adopted § 575 of the Restatement of Torts to define the term "trade secrets", as follows:
[A]ny formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business ... in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid....
The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.... Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
Continental Research Corp. v. Scholz, 595 S.W.2d 396, 400-01 (Mo.Ct.App.1980), quoting National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 18-19 (Mo. banc 1966) (emphasis added). See also Metal Lubricants Company v. Engineered Lubricants Co., 284 F.Supp. 483 (E.D.Mo.1968); Hedenkamp, 671 S.W.2d at 399-400. An analysis of these factors leads this Court to conclude that Sigma's product and vendor files are entitled to trade secret protection.
The first factor is the extent to which the information that is alleged to be a trade secret is known outside of the employer's business. Defendant argues that much of the information contained in Sigma's product and vendors files is in the public domain, because some of said information consists of excerpts from suppliers' published catalogues and marketing materials. Defendant's argument fails to fully understand the nature of the information that Sigma seeks to protect. Sigma's knowledge of which supplier, of the many potential suppliers for each and every one of the 10,000 chemicals it purchases, is able to supply that chemical at the requisite quality and price is not in the public domain. See Findings of Fact Nos. 1 and 6. No one outside of Sigma knows which supplier is Sigma's source for a particular product sold by Sigma. Id. The distinction is the difference between knowing that firms, A, B, C, D, and E are suppliers of product X and knowing that reseller S purchases X from C. In addition, the secret information contained in Sigma's product and vendor files extends beyond the identity of Sigma's particular source for a particular product. Other information that is not in the public domain includes the negotiated price that Sigma pays for a particular product, the results of Sigma's quality control tests, the quantities in which plaintiff purchases particular products, and sales and purchasing history for a given product. See Findings of Fact No. 6. The confidentiality of Sigma's proprietary information is not lost by the facts that it must reveal certain isolated information to shippers, airlines, and customs officials or that Sigma purchases some of its products from competitors. See Findings of Fact No. 8. Thus, the information contained in Sigma's product and vendor files is not known outside of Sigma to any significant extent.
*1262 The second factor is the extent to which the trade secret information is known internally. The evidence on this factor is that, of Sigma's approximately 900 employees, only the 28 employees in the purchasing and competition departments have regular and frequent access to the product and vendor files. See Findings of Fact No. 11. Other employees, such as those involved with shipping and receiving, may occasionally be exposed to isolated examples of information that could be found in Sigma's product and vendor files, but the extent of said exposure is not great enough to warrant a conclusion that Sigma's trade secret information is generally known throughout Sigma's work force. Moreover, the technical and scientific nature of much of Sigma's trade secret information makes the possibility that said employees could either understand or exploit said information very unlikely.
The third factor is the extent of the measures taken by the employer to guard the secrecy of the information sought to be protected. The measures taken by Sigma consist of armed guards, colorcoded identification badges, and work rules regarding the removal of product and vendor files and the presence of visitors. See Findings of Fact No. 8. Although defendant attempted to attack these measures with evidence that the identification badge rule is not strictly enforced within Sigma's premises, there was no evidence that this laxity resulted in unauthorized employees having access to the product and vendor files. Id. In addition, Sigma sought to protect the confidentiality of its proprietary information by requiring certain critical employees to sign employment contracts containing restrictive covenants and non-disclosure agreements. See Findings of Fact No. 9. Defendant takes issue with the fact that only half of Sigma's work force was required to sign such contracts. However, Sigma properly made the judgment that such contracts were not necessary for employees who, because of their lack of significant experience or educational background in the chemical field, did not pose a serious threat to Sigma through the use of Sigma's confidential proprietary information. Id. In addition, there was no evidence that Sigma's failure to require such employees to sign non-compete and non-disclosure contracts had ever resulted in misappropriation or misuse of Sigma's confidential proprietary information. This Court concludes that Sigma has taken adequate and reasonable steps to keep its trade secret information secret.
The fourth factor is the value of the trade secret information to the employer and to its competitors. The information contained in Sigma's product and vendor files is valuable to Sigma, because it enables Sigma to choose, from among thousands, the supplier that provides the particular product that meets Sigma's price and quality standards. See Findings of Fact Nos. 1 and 4. Without its vast network of files, Sigma would be unable to locate the "needle in the haystack". See Findings of Fact No. 5. The results of Sigma's quality control program are also valuable to avoid customer complaints and to locate and discard suppliers whose products result in unsatisfied customers. See Findings of Fact No. 3. Further, the fact that several of Sigma's competitors attempt to maintain similar types of compilations of information and treat said information as confidential, is particularly supportive of this Court's conclusion that Sigma's product and vendor files are valuable to Sigma and would be valuable to its competitors. See Findings of Fact No. 7. A competitor would not expend the effort required to maintain 200,000 index cards over a period of 27 years, if the information maintained on those cards were not valuable. Id.
The fifth factor is the amount of effort or money expended by the employer in developing the trade secret information. The evidence on this factor is that Sigma has developed its product and vendor files over a period of 40 years at a significant cost. See Findings of Fact No. 6. Moreover, one of defendant's witnesses, Jerry Annunciato, testified that competitors in Sigma's business are inundated with suppliers' marketing information on a daily basis *1263 and that abstracting such information is a full time job. See Findings of Fact No. 7. It is obvious that it requires no small amount of effort to sift through the vast amount of information supplied by the vast number of suppliers to choose that supplier which provides a particular item of a particular quality at a profitable price. Id.
The final factor is the ease or difficulty with which the trade secret information could be properly acquired or duplicated by others. The evidence which is relevant to this factor is that there is a vast quantity of supplier marketing material in existence and that it has taken Sigma approximately 40 years to develop its product and vendor files in their current state. See Findings of Fact Nos. 6 and 7. In addition, one of Sigma's competitors, Jerry Annunciato with K & K, testified to the amount of time and effort required to abstract suppliers' product offering information. See Findings of Fact No. 7. Under these circumstances, this Court concludes that it would be very difficult for a competitor to duplicate the trade secret information contained in Sigma's product and vendor files.
Based on the foregoing, it is the opinion of this Court that the compilation of information contained in plaintiff's product and vendor files constitutes a trade secret. In National Rejectors, Inc. v. Trieman, 409 S.W.2d 1 (Mo. banc 1966), the Missouri Supreme Court noted that a "compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it" may be protected as a trade secret. Id. at 18 (quoting from comment b to § 757, Restatement of Torts). Sigma's product and vendor files constitute such a compilation. Said compilation is the result of years of researching, testing, negotiating and searching. Sigma has determined for each and every one of the 10,000 chemicals it purchases for resale which one of the many potential suppliers is able to supply a particular chemical at the requisite quality and price to meet Sigma's rigid standards. This determination is not known outside of Sigma to any significant extent and it is as much a key to Sigma's business success as a secret formula or manufacturing process is to other firms.
The cases relied on by defendant are factually distinguishable from the case at bar. See, e.g., Pressure Science, Inc. v. Kramer, 413 F.Supp. 618 (D.Conn.), aff'd. without opinion, 551 F.2d 301 (2d Cir. 1976) (production technique); Cudahy Company v. American Laboratories, Inc., 313 F.Supp. 1339 (D.Neb.1970) (profit, cost, customer, plant design, and production technique information); Hayden's Sport Center, Inc. v. Johnson, 109 Ill.App.3d 1140, 65 Ill.Dec. 612, 441 N.E.2d 927 (1982) (pricing information based on cost, suppliers' catalogue and price, and volume of purchase); McCann v. Bosman, 44 Ill. App.3d 1020, 3 Ill.Dec. 655, 358 N.E.2d 1340 (1977) (customer list); J.T. Healy & Sons, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 260 N.E.2d 723 (1970) (process to make jewelry parts); Dynamics Research Corp. v. Analytic Sciences, Corp., 9 Mass.App. 254, 400 N.E.2d 1274 (1980) (management information system); Josten's, Inc. v. National Computer Systems, 318 N.W.2d 691 (Minn.1982) (computer system). Defendant relies on most of these cases to support his argument that Sigma's efforts to maintain the secrecy and security of its product and vendor files were inadequate. In these cases, facts which were considered significant to the finding that no trade secret existed, included the following: 1) the claimed trade secret was easily learned or duplicated; 2) there was a total absence of non-disclosure or non-competition contracts; 3) observation of the claimed trade secret was allowed during public tours of plants; 4) detailed discussions or presentations of the claimed trade secret took place at seminars or in scientific publications; 5) there was an absence of efforts to maintain the secrecy or security of the claimed trade secret; 6) the claimed trade secret was publicly available; or 7) the claimed trade secret was available to all of the employers' employees and not internally restricted. In the case at bar, the information contained *1264 in Sigma's product and vendor files cannot be easily duplicated, Sigma utilized non-disclosure and non-competition contracts where necessary, the public did not have access to Sigma's product and vendor files, the contents of the product and vendor files were not otherwise published by Sigma, Sigma took reasonable steps to maintain the security of its product and vendor files, the identity of Sigma's suppliers is not publicly available, and Sigma's employees did not have unfettered access to Sigma's product and vendor files.
Because Sigma's product and vendor files constitute a trade secret and because the temporal and geographic scope of the restrictive covenant in Harris' employment contract with Sigma is reasonable, said restrictive covenant is valid and enforceable.

2. Propriety of Permanent Injunctive Relief
The principles which guide this Court in determining whether permanent injunctive relief is appropriate in this case are well known. "[T]he determination whether to issue an injunction involves a balancing of the interests of the parties who might be affected by the Court's decisionthe hardship on plaintiff if relief is denied as opposed to the hardship to defendant if it is granted...." 11 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2942 at 366-67 (1973). Moreover, "the main prerequisite to obtaining injunctive relief is a finding that plaintiff is being threatened by some injury for which he has no adequate legal remedy." Id. at 368-69. In the opinion of this Court, Sigma is entitled to permanent injunctive relief in this case.
First, it is clear that Harris is violating or would violate the restrictive covenant in his employment contract by working for ICN as a purchasing agent. See Findings of Fact Nos. 13, 22, 23, 24, 25, and 26. Given Harris' responsibilities and activities at ICN, as well as the overlap both between the products sold by Sigma and the products sold by ICN and between the products on Harris' stock status list at Sigma and the products for which Harris is responsible at ICN, Harris is contributing his knowledge to a service or product which is competitive with and similar to a service or product on which Harris worked at Sigma. See Findings of Fact Nos. 22, 23, 25 and 26. In addition, Harris is in a position where it is very likely that he will, directly or indirectly, use or disclose trade secret information that Harris learned from Sigma's product and vendor files. Under these circumstances, there is a strong threat of irreparable injury to Sigma. Plaintiff stands to lose part of a competitive edge that has taken over forty (40) years to develop. The threat that Harris poses to Sigma is particularly great in view of defendant's own testimony that he had memorized some information through daily use and that he was the "best source person" at Sigma. See Findings of Fact No. 15. Moreover, the facts that defendant attempted to mislead plaintiff about his new employment, see Findings of Fact No. 20, that Harris violated his contract with Sigma by not advising Sigma of his new employer, id., that Harris solicited some of plaintiff's suppliers in the course of working for ICN, see Findings of Fact No. 22, and that Harris apparently violated this Court's preliminary injunction on May 17, 1984, see Findings of Fact No. 25, strongly suggests a threat of harm to plaintiff. See Modern Controls, Inc. v. Andreadakis, 578 F.2d 1264, 1270 (8th Cir.1978); Minnesota Mining and Manufacturing Co. v. Kirkevold, 87 F.R.D. 324, 327 (D.Minn.1980); Mixing Equipment Co. v. Philadelphia Gear, Inc., 312 F.Supp. 1269 (E.D.Pa.1970).
On the other hand, the harm that would occur to Harris if a permanent injunction were granted is not insubstantial. By the terms of the restrictive covenant, Harris will be prevented from working for ICN until November 22, 1985. See Findings of Fact No. 14. In addition, Harris may be barred from utilizing his knowledge of Sigma's sources in the fine chemical business, so long as Sigma's trade secret information remains secret. However, the harm to Harris during the duration of the restrictive covenant is tempered by ICN's extension of *1265 credit. See Findings of Fact No. 28. The potential harm to Harris is also diminished by the fact that other Sigma former employees have not had difficulty obtaining other employment at chemical companies, pharmaceutical companies, laboratories, universities and biotechnical companies, all of which do not compete with Sigma. See Findings of Fact No. 10. Further, the balance of the equities do not favor Harris because he was aware of the restrictions imposed on him by his contract with Sigma and he took a voluntary, knowing and calculated risk by deciding to violate that contract.
On balance, it is the opinion of this Court that the threat of harm to Sigma if an injunction were not granted greatly outweighs the threat of harm to Harris if an injunction were granted. Accordingly, Sigma is entitled to permanent injunctive relief.

ORDER
Pursuant to the Memorandum filed herein this day,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that defendant be and is hereby restrained and enjoined from: 1) rendering services directly or indirectly to or for ICN Pharmaceuticals, Inc., as a purchasing agent involved in the purchase of, or the selection of sources of supply for, chemicals which are also sold by Sigma, until November 22, 1985, or further Order of this Court, whichever first occurs; and 2) using or disclosing any trade secret or other confidential information that is the property of plaintiff which defendant acquired by reason of his employment with plaintiff.

On Motion to Alter or Amend
IT IS HEREBY ORDERED that plaintiff's motion to alter or amend the judgment be and is denied. In the opinion of this Court, the breadth of the April 3, 1985 injunction is appropriate.