SIGMA CHEMICAL
COMPANY, Appellee,

v.

Foster HARRIS, Appellant.

SIGMA CHEMICAL
COMPANY, Appellant,

v.

Foster HARRIS, Appellee.

Nos. 85–1616, 85–1654.

United States Court of Appeals,
Eighth Circuit.

June 26, 1986.

Alan C. Kohn, St. Louis, Mo., for appellant.

Barry S. Ginsburg, Clayton, Mo., for appellee.

Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and MURPHY,* District Judge.

McMILLIAN, Circuit Judge.

Foster Harris appeals from a final judgment entered in the District Court[1] for the Eastern District of Missouri enjoining him from employment for a two-year period with ICN Pharmaceuticals, Inc. (ICN), and from using and disclosing trade secrets. Sigma Chemical Company (Sigma) cross-appeals. For the reasons discussed below, we affirm in part and reverse in part appeal No. 85–1616 and remand for further proceedings, and we affirm cross-appeal No. 85–1654.

The district court has fully set forth the facts in its opinion. *Sigma Chemical Co. v. Harris*, 605 F.Supp. 1253, 1254–60 (E.D. Mo.1985). Briefly, the following is relevant to this appeal. Sigma sells 16,000 esoteric chemicals used in research, production, and analysis. Sigma purchases 10,000 of these chemicals from approximately

---

* The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota, sitting by designation.

1. The Honorable John F. Nangle, Chief Judge, United States District Court for the Eastern District of Missouri.

2,300 suppliers. Sigma analyzes the purchased chemicals and packages them in smaller units for resale. For example, Sigma sells pure salt. Although common table salt can be purchased in a grocery store, Sigma expends time and effort to determine which supplier is capable of producing the requisite quality of pure salt for scientific research. The results of Sigma's chemical analyses are not made known to the supplier; Sigma does not inform the supplier of the reasons if it rejects the chemical.

Sigma maintains product and vendor files containing information about the chemicals purchased for resale. Sigma has developed these files over 40 years. "A typical product file contains the name of the product, information regarding Sigma's source or sources for the product, quality control testing information, price and purchasing history information, and complaints, if any, from customers." *Id.* at 1255. "A typical vendor file consists of the supplier's name, and price and quality information regarding products purchased from that vendor." *Id.*

Harris was an experienced purchasing agent at Sigma. Although Harris had signed a restrictive covenant prohibiting him from working for a competitor of Sigma for a period of two years following his termination at Sigma and prohibited him from using or disclosing Sigma's trade secrets,[2] within two years of his termination at Sigma Harris went to work as a purchasing agent for ICN, one of Sigma's top competitors.

The district court found that the information contained in Sigma's product and vendor files was protected trade secrets and that the restrictive covenant was reasonable as to time and geographic location and therefore enjoined Harris from working as a purchasing agent for ICN for the period of time covered by the covenant and from disclosing or using trade secrets.

In this diversity case it is undisputed that Missouri law applies. In diversity cases "the interpretation of state law by a federal district judge sitting in that forum is entitled to substantial deference." *Kifer v. Liberty Mutual Insurance Co.*, 777 F.2d 1325, 1330 (8th Cir.1985). We are, however, " 'not inextricably bound by the [district] court's ruling,' and in an appropriate case we must reverse if we find that the district court's interpretation of state law is ... 'lacking in reasoned authority.' " *Id.* (citation omitted).

■ Harris first asserts that the district court's finding that the information contained in the product and vendor files constituted trade secrets was clearly erroneous. Appellant asserts that much of the information contained in the files, such as the names of suppliers, products, price and constituent parts, was in the public domain; that Sigma did not adequately safeguard the information; that many of Sigma's employees were not bound by restrictive covenants; and that Sigma revealed excerpts of the files to customs officials.

The district court rejected these contentions. The district court found that while some of the information in the files was in the public domain, Sigma's knowledge of which suppliers supplied which chemicals at the requisite quality and price was not in the public domain;[3] that Sigma took exten-

---

2. The covenant provided in pertinent part:

I shall not, directly or indirectly ... for a period of two years following termination for any reason of my employment with the Company engage in or contribute my knowledge to any work or activity that involves a product, process, service or development which is then competitive with and the same as or similar to a product, process, service or development on which I worked or with respect to which I had access to Confidential Information while with the Company....

    ....

Following expiration of said two-year period, I shall continue to be obligated under the "Confidential Information" section of this Agreement not to use or to disclose Confidential Information so long as it shall remain proprietary or protectible as confidential or trade secret information.

3. In rejecting a similar argument, the Federal Circuit has held that " 'a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and

sive measures (armed guards, colored-coded badges, and work rules concerning the removal of the product and vendor files) to safeguard its product and vendor files; that those employees who were not required to sign noncompetition clauses did not present a risk to Sigma; and that Sigma's disclosure of excerpts of the files to customs officials did not destroy the confidentiality of the files. 605 F.Supp. at 1255–56. The district court also noted that the value of the information to Sigma was great, that Sigma had expended great cost and effort over 40 years to develop the files, and that it would have been difficult for a competitor to duplicate the information. *Id.* at 1263. These findings are not clearly erroneous.

■ Harris next argues that the district court erred as a matter of law in enforcing the restrictive covenant because the covenant did not contain time and place restrictions. Under Missouri law, "[c]ovenants against competition ... must be reasonably limited in time and space." *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 74 (Mo. banc 1985).

Harris argues that the noncompetition covenant was unenforceable because it failed to contain a geographical restriction. He relies on *National Motor Club of Missouri, Inc. v. Noe*, 475 S.W.2d 16, 22 (Mo. 1972), in which the state supreme court found that a noncompetition agreement was "void as against public policy because [it was] not reasonably limited to any territory of competition." The district court found that *National Motor Club of Missouri, Inc. v. Noe* was inapplicable to the instant case because, unlike the case before the court, there was no evidence of worldwide competition. The district court noted that "the test for the reasonableness of the

operation of which, in unique combination, affords a competitive advantage and is a protectable secret.' " *Syntex Opthalmics, Inc. v. Novicky*, 745 F.2d 1423, 1434 (Fed.Cir.1984) (citation omitted), *vacated on other grounds*, —— U.S. ——, 105 S.Ct. 1740, 84 L.Ed.2d 807 (1985).

4. There has been a long-standing dispute among the federal circuits about whether a party misappropriating trade secrets should

geographic scope of a restrictive covenant is whether it is 'no greater than fairly required for protection,' " 605 F.Supp. at 1260, *citing Continental Research Corp. v. Scholz*, 595 S.W.2d 396, 400 (Mo.Ct.App. 1980), and that in the instant case a worldwide restriction was reasonable because Sigma competed worldwide.

We need not decide whether Harris is correct in his assertion that under Missouri law the covenant was unenforceable because of a lack of a geographical restriction. In this case, the district court did not issue a worldwide injunction but only enforced the covenant to prohibit Harris' employment with ICN, clearly a reasonable restriction. Missouri courts "have decreed enforcement as against a defendant whose breach occurred within an area in which restriction would clearly be reasonable, even though the terms of the agreement imposed a larger and unreasonable restraint." *R.E. Harrington, Inc. v. Frick*, 428 S.W.2d 945, 951 (Mo.App.1968).

■ Harris also argues that the district court erred in enjoining disclosure of trade secrets because the nondisclosure covenant was unlimited as to time. The district court found that issuance of an injunction was proper because even in the absence of a nondisclosure covenant employees are under an "absolute, temporally unlimited duty not to disclose his/her employer's trade secrets." *Sigma Chemical Co. v. Harris*, 586 F.Supp. 704, 710 (E.D.Mo.1984) (memorandum opinion granting preliminary injunction). The district court, however, cited no Missouri case law in support but relied on *Nucor Corp. v. Tennessee Forging Steel Service, Inc.*, 476 F.2d 386, 392 (8th Cir.1973), in which this court applied Arkansas law.[4] Although Missouri law

be enjoined permanently from using the information or whether the duration of the injunction should be limited to put the defendant in the position it would have been in absent the misappropriation. Although discussion of this issue often focuses on the disagreements between the circuits, ... trade secret law is state law, and the federal appellate decisions are not necessarily the final word on these issues of state law.

recognizes that employees are under an implied duty not to disclose trade secrets, the Missouri Supreme Court has stated that "in cases where the court has granted injunctive relief based upon the misuse of actual trade secrets, the courts have limited the injunction to the time which would have been required to reproduce a copyable product." *National Rejectors, Inc. v. Trieman,* 409 S.W.2d 1, 43 (Mo. banc 1966).

We believe the statement from *National Rejectors, Inc. v. Trieman* is in conflict with the district court's holding that employees are under a "temporally unlimited" duty not to disclose trade secrets. *See also Carboline Co. v. Jarboe,* 454 S.W.2d 540, 552–53 (Mo.1970) (trade secret injunction should be limited to time in which products could be reproduced absent wrongful appropriation). In trade secret injunctions, "many ... jurisdictions have used this 'independent development test.'" *Syntex Opthalmics, Inc. v. Novicky,* 745 F.2d 1423, 1435–36 n. 23 (Fed.Cir.1984) (*Syntex*), *vacated on other grounds,* — U.S. ——, 105 S.Ct. 1740, 84 L.Ed.2d 807 (1985). In *Syntex,* a case factually similar to the case at bar, the Federal Circuit Court of Appeals affirmed a district court's finding that under Illinois law a "set of processes and ingredients" used in the manufacture of contact lenses was entitled to trade secrets protection. *Id.* at 1433–34. The Federal Circuit, however, found that the durational scope of the injunction issued by the district court to prohibit disclosure of trade secrets was too broad under Illinois law. "Under Illinois law an injunction in a trade secret case must be limited to the approximate length of time necessary for the defendant to duplicate the trade secrets by lawful means." *Id.* at 1435.[5] The appellate court believed that the district court's error was important because extending the injunction beyond the time needed for independent development would give the em-

ployer " 'a windfall protection and would subvert the public interest in fostering competition and in allowing employees to make full use of their knowledge and ability.' " *Id.* (citations omitted).

We believe the part of the injunction prohibiting disclosure of trade secrets must be limited in duration and, accordingly, reverse in part and remand the case to the district court for consideration of the time it would take a "legitimate competitor" to independently reproduce the information contained in the product and vendor files. *See National Rejectors, Inc. v. Trieman,* 409 S.W.2d at 43, *citing Winston Research Corp. v. Minnesota Mining & Manufacturing Co.,* 350 F.2d 134, 142 (9th Cir. 1965). On remand, the district court should also modify the language of the injunction to expressly state that Harris may use that information which is already in the public domain. *See Syntex,* 765 F.2d at 1437 ("because the misappropriated trade secrets consist of a compilation of reactions ... [the] injunction should be modified to assure that appellant will not be in contempt merely through the use of already known individual reactions or ingredients").

We have considered Harris' other arguments and find them to be without merit. Accordingly, appeal No. 85–1616 is affirmed in part and reversed in part and remanded for further proceedings consistent with this opinion.

■ We have considered Sigma's contention raised on cross-appeal that the district court erred in failing to enjoin Harris from working for ICN in any capacity and find it to be without merit. Appeal No. 85–1654 is affirmed.

*American Can Co. v. Mansukhani,* 742 F.2d 314, 334 n. 24 (7th Cir.1984) (citations and emphasis in original omitted).

**5.** The Federal Circuit found that the district court erred in extending the injunction for 20 years based on testimony that it took Syntex 20

years to develop the process. The court believed that it would not necessarily take the employee 20 years to recreate independently the trade secrets and remanded the case for further consideration of the time it would take for independent production of the trade secrets.